GRANHOLM, GOVERNOR OF MICHIGAN, ET AL. *v.* HEALD ET AL.

No. 03–1116.   Argued December 7, 2004—Decided May 16, 2005*

---

*Together with No. 03–1120, *Michigan Beer & Wine Wholesalers Assn.* v. *Heald et al.*, also on certiorari to the same court, and No. 03–1274, *Swedenburg et al.* v. *Kelly, Chairman, New York Division of Alcoholic Beverage Control, State Liquor Authority, et al.*, on certiorari to the United States Court of Appeals for the Second Circuit.

KENNEDY, J., delivered the opinion of the Court, in which SCALIA, SOU-TER, GINSBURG, and BREYER, JJ., joined. STEVENS, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 493. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and STEVENS and O'CON-NOR, JJ., joined, *post*, p. 497.

*Clint Bolick* argued the cause for petitioners in No. 03–1274. With him on the briefs were *William H. Mellor, Steven M. Simpson,* and *Lance J. Gotko. Kathleen M. Sullivan* argued the cause for respondents in Nos. 03–1116 and 03–1120. With her on the brief were *James A. Tanford, Robert D. Epstein,* and *Kenneth W. Starr.*

*Thomas L. Casey,* Solicitor General of Michigan, argued the cause for petitioners in Nos. 03–1116 and 03–1120. With him on the briefs in No. 03–1116 were *Michael A. Cox,* Attorney General, and *Donald S. McGehee,* Assistant Attorney General. *Anthony S. Kogut, John A. Yeager, Curtis R. Hadley, Louis R. Cohen, C. Boyden Gray,* and *Todd Zubler* filed a brief for petitioner in No. 03–1120. *Caitlin J. Halligan,* Solicitor General of New York, argued the cause for respondents in No. 03–1274. With her on the brief for the state respondents were *Eliot Spitzer,* Attorney General, *Daniel Smirlock,* Deputy Solicitor General, and *Gregory Klass* and *Shaifali Puri,* Assistant Solicitors General.

*Miguel A. Estrada, Mark A. Perry, Howard Graff, Victoria A. Kummer, Robert M. Heller, J. Warren Mangan,* and *Alan J. Gardner* filed a brief for the private respondents.†

---

†Briefs of *amici curiae* urging reversal in No. 03–1116 were filed for the State of Ohio et al. by *Jim Petro,* Attorney General of Ohio, *Douglas R. Cole,* State Solicitor, *Stephen P. Carney,* Senior Deputy Solicitor, and *Peter M. Thomas,* Assistant Solicitor, and by the Attorneys General for their respective jurisdictions as follows: *Troy King* of Alabama, *Mike Beebe* of Arkansas, *Richard Blumenthal* of Connecticut, *M. Jane Brady* of Delaware, *Robert J. Spagnoletti* of the District of Columbia, *Charlie Crist* of Florida, *Thurbert E. Baker* of Georgia, *Mark J. Bennett* of Hawaii, *Lisa Madigan* of Illinois, *Steve Carter* of Indiana, *Phill Kline* of Kansas, *Gregory D. Stumbo* of Kentucky, *Charles C. Foti, Jr.,* of Louisiana, *G. Steven Rowe* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Mike Hatch* of Minnesota, *Jim Hood* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Mike McGrath* of Montana, *Jon Bruning* of Nebraska, *Brian Sandoval* of Nevada, *Peter C. Harvey* of New Jersey, *Wayne Stenehjem* of North Dakota, *Gerald J. Pappert* of Pennsylvania, *Patrick Lynch* of Rhode Island, *Lawrence E. Long* of South Dakota, *Paul G. Summers* of Tennessee, *Greg Abbott* of Texas, *Mark L. Shurtleff* of Utah, *William H. Sorrell* of Vermont, and *Peggy A. Lautenschlager* of

JUSTICE KENNEDY delivered the opinion of the Court.

These consolidated cases present challenges to state laws regulating the sale of wine from out-of-state wineries to consumers in Michigan and New York. The details and me-

Wisconsin; in Nos. 03–1116 and 03–1120 for the Michigan Association of Secondary School Principals et al. by *Eric J. Eggan* and *Irene M. Mead;* and in No. 03–1274 for the Virginia Wineries Association by *Thomas A. Bowden, Randy E. Barnett, Richard A. Epstein,* and *Susan Beth Farmer.*

Briefs of *amici curiae* urging affirmance in No. 03–1116 were filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, and *Manuel M. Medeiros,* Solicitor General, *Christine O. Gregoire,* Attorney General of Washington, and *Narda Pierce,* Solicitor General, *Patricia A. Madrid,* Attorney General of New Mexico, *Hardy Myers,* Attorney General of Oregon, and *Darrell V. McGraw, Jr.,* Attorney General of West Virginia; and for the Wine Institute by *James M. Seff* and *Kevin M. Fong;* and in No. 03–1274 for the Beer Institute by *Steven G. Brody* and *James K. Goldfarb.*

Briefs of *amici curiae* urging affirmance in Nos. 03–1116 and 03–1120 were filed for Members of the United States Congress by *John L. Oberdorfer* and *Roy T. Englert, Jr.;* for the American Homeowners Alliance et al. by *Paul Bender, Michael R. Klipper, Christopher A. Mohr,* and *Steven J. Metalitz;* for the Cargo Airline Association by *Drew S. Days III, Beth S. Brinkmann, Seth M. Galanter, Paul T. Friedman, Ruth N. Borenstein,* and *Stephen A. Alterman;* for the DKT Liberty Project by *William H. Hohengarten* and *Julia M. Carpenter;* for the Goldwater Institute by *Mark Brnovich;* for Napa Valley Vintners et al. by *Carter G. Phillips* and *Mark E. Haddad;* for WineAmerica, Inc., et al. by *Robert P. Mahnke, Susan Estrich,* and *James N. Czaban;* and for George A. Akerlof et al. by *Stuart Banner.*

Briefs of *amici curiae* urging affirmance in No. 03–1274 and reversal in Nos. 03–1116 and 03–1120 were filed in all cases for the Illinois Alcoholism and Drug Dependence Association by *Claudette P. Miller;* and for the Wine and Spirits Wholesalers of America et al. by *H. Bartow Farr III, Viet D. Dinh,* and *M. Craig Wolf; James M. Goldberg* filed a brief in all cases for the National Alcohol Beverage Control Association et al. as *amici curiae* urging reversal in Nos. 03–1116 and 03–1120.

*Michael D. Madigan, Katherine E. Becker, Stephen M. Diamond,* and *Paul R. Romain* filed a brief as *amicus curiae* for the National Beer Wholesalers Association in Nos. 03–1116 and 03–1120 urging reversal in both cases and affirmance in No. 03–1274.

*Robert S. Getman* filed a brief for Millbrook Vineyards & Winery as *amicus curiae* in No. 03–1274.

chanics of the two regulatory schemes differ, but the object
and effect of the laws are the same: to allow in-state wineries
to sell wine directly to consumers in that State but to pro-
hibit out-of-state wineries from doing so, or, at the least, to
make direct sales impractical from an economic standpoint.
It is evident that the object and design of the Michigan and .
New York statutes is to grant in-state wineries a competitive
advantage over wineries located beyond the States' borders.

We hold that the laws in both States discriminate against
interstate commerce in violation of the Commerce Clause,
Art. I, § 8, cl. 3, and that the discrimination is neither author-
ized nor permitted by the Twenty-first Amendment. Ac-
cordingly, we affirm the judgment of the Court of Appeals
for the Sixth Circuit, which invalidated the Michigan laws;
and we reverse the judgment of the Court of Appeals for the
Second Circuit, which upheld the New York laws.

## I

Like many other States, Michigan and New York regulate
the sale and importation of alcoholic beverages, including
wine, through a three-tier distribution system. Separate li-
censes are required for producers, wholesalers, and retailers.
See FTC, Possible Anticompetitive Barriers to E-Commerce:
Wine 5–7 (July 2003) (hereinafter FTC Report), available at
http://www.ftc.gov/os/2003/07/winereport2.pdf (all Internet
materials as visited May 11, 2005, and available in Clerk of
Court's case file). The three-tier scheme is preserved by a
complex set of overlapping state and federal regulations.
For example, both state and federal laws limit vertical inte-
gration between tiers. *Id.*, at 5; 27 U. S. C. § 205; see, *e. g.*,
*Bainbridge* v. *Turner*, 311 F. 3d 1104, 1106 (CA11 2002). We
have held previously that States can mandate a three-tier
distribution scheme in the exercise of their authority under
the Twenty-first Amendment. *North Dakota* v. *United
States*, 495 U. S. 423, 432 (1990); *id.*, at 447 (SCALIA, J., con-
curring in judgment). As relevant to today's cases, though,

the three-tier system is, in broad terms and with refinements to be discussed, mandated by Michigan and New York only for sales from out-of-state wineries. In-state wineries, by contrast, can obtain a license for direct sales to consumers. The differential treatment between in-state and out-of-state wineries constitutes explicit discrimination against interstate commerce.

This discrimination substantially limits the direct sale of wine to consumers, an otherwise emerging and significant business. FTC Report 7. From 1994 to 1999, consumer spending on direct wine shipments doubled, reaching $500 million per year, or three percent of all wine sales. *Id.*, at 5. The expansion has been influenced by several related trends. First, the number of small wineries in the United States has significantly increased. By some estimates there are over 3,000 wineries in the country, WineAmerica, The National Association of American Wineries, Wine Facts 2004, http://www.americanwineries.org/newsroom/winefacts04.htm, more than three times the number 30 years ago, FTC Report 6. At the same time, the wholesale market has consolidated. Between 1984 and 2002, the number of licensed wholesalers dropped from 1,600 to 600. Riekhof & Sykuta, Regulating Wine by Mail, 27 Regulation, No. 3, pp. 30, 31 (Fall 2004), available at http://www.cato.org/pubs/regulation/regv27n3/v27n3-3.pdf. The increasing winery-to-wholesaler ratio means that many small wineries do not produce enough wine or have sufficient consumer demand for their wine to make it economical for wholesalers to carry their products. FTC Report 6. This has led many small wineries to rely on direct shipping to reach new markets. Technological improvements, in particular the ability of wineries to sell wine over the Internet, have helped make direct shipments an attractive sales channel.

Approximately 26 States allow some direct shipping of wine, with various restrictions. Thirteen of these States have reciprocity laws, which allow direct shipment from win-

eries outside the State, provided the State of origin affords similar nondiscriminatory treatment. *Id.*, at 7–8. In many parts of the country, however, state laws that prohibit or severely restrict direct shipments deprive consumers of access to the direct market. According to the Federal Trade Commission (FTC), "[s]tate bans on interstate direct shipping represent the single largest regulatory barrier to expanded e-commerce in wine." *Id.*, at 3.

The wine producers in the cases before us are small wineries that rely on direct consumer sales as an important part of their businesses. Domaine Alfred, one of the plaintiffs in the Michigan suit, is a small winery located in San Luis Obispo, California. It produces 3,000 cases of wine per year. Domaine Alfred has received requests for its wine from Michigan consumers but cannot fill the orders because of the State's direct-shipment ban. Even if the winery could find a Michigan wholesaler to distribute its wine, the wholesaler's markup would render shipment through the three-tier system economically infeasible.

Similarly, Juanita Swedenburg and David Lucas, two of the plaintiffs in the New York suit, operate small wineries in Virginia (the Swedenburg Estate Vineyard) and California (the Lucas Winery). Some of their customers are tourists, from other States, who purchase wine while visiting the wineries. If these customers wish to obtain Swedenburg or Lucas wines after they return home, they will be unable to do so if they reside in a State with restrictive direct-shipment laws. For example, Swedenburg and Lucas are unable to fill orders from New York, the Nation's second-largest wine market, because of the limits that State imposes on direct wine shipments.

## A

We first address the background of the suit challenging the Michigan direct-shipment law. Most alcoholic beverages in Michigan are distributed through the State's three-tier

system. Producers or distillers of alcoholic beverages, whether located in state or out of state, generally may sell only to licensed in-state wholesalers. Mich. Comp. Laws Ann. §§ 436.1109(1), 436.1305, 436.1403, 436.1607(1) (West 2000); Mich. Admin. Code Rules 436.1705 (1990), 436.1719 (2000). Wholesalers, in turn, may sell only to in-state retailers. Mich. Comp. Laws Ann. §§ 436.1113(7), 436.1607(1) (West 2001). Licensed retailers are the final link in the chain, selling alcoholic beverages to consumers at retail locations and, subject to certain restrictions, through home delivery. §§ 436.1111(5), 436.1203(2)–(4).

Under Michigan law, wine producers, as a general matter, must distribute their wine through wholesalers. There is, however, an exception for Michigan's approximately 40 in-state wineries, which are eligible for "wine maker" licenses that allow direct shipment to in-state consumers. § 436.1113(9) (West 2001); §§ 436.1537(2)–(3) (West Supp. 2004); Mich. Admin. Code Rule 436.1011(7)(b) (2003). The cost of the license varies with the size of the winery. For a small winery, the license is $25. Mich. Comp. Laws Ann. § 436.1525(1)(d) (West Supp. 2004). Out-of-state wineries can apply for a $300 "outside seller of wine" license, but this license only allows them to sell to in-state wholesalers. §§ 436.1109(9) (West 2001), 436.1525(1)(e) (West Supp. 2004); Mich. Admin. Code Rule 436.1719(5) (2000).

Some Michigan residents brought suit against various state officials in the United States District Court for the Eastern District of Michigan. Domaine Alfred, the San Luis Obispo winery, joined in the suit. The plaintiffs contended that Michigan's direct-shipment laws discriminated against interstate commerce in violation of the Commerce Clause. The trade association Michigan Beer & Wine Wholesalers intervened as a defendant. Both the State and the wholesalers argued that the ban on direct shipment from out-of-state wineries is a valid exercise of Michigan's power under § 2 of the Twenty-first Amendment.

On cross-motions for summary judgment the District Court sustained the Michigan scheme. The Court of Appeals for the Sixth Circuit reversed. *Heald* v. *Engler*, 342 F. 3d 517 (2003). Relying on *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984), the court rejected the argument that the Twenty-first Amendment immunizes all state liquor laws from the strictures of the Commerce Clause, 342 F. 3d, at 524, and held the Michigan scheme was unconstitutional because the defendants failed to demonstrate the State could not meet its proffered policy objectives through nondiscriminatory means, *id.*, at 527.

### B

New York's licensing scheme is somewhat different. It channels most wine sales through the three-tier system, but it too makes exceptions for in-state wineries. As in Michigan, the result is to allow local wineries to make direct sales to consumers in New York on terms not available to out-of-state wineries. Wineries that produce wine only from New York grapes can apply for a license that allows direct shipment to in-state consumers. N. Y. Alco. Bev. Cont. Law Ann. § 76–a(3) (West Supp. 2005) (hereinafter N. Y. ABC Law). These licensees are authorized to deliver the wines of other wineries as well, § 76–a(6)(a), but only if the wine is made from grapes "at least seventy-five percent the volume of which were grown in New York state," § 3(20–a). An out-of-state winery may ship directly to New York consumers only if it becomes a licensed New York winery, which requires the establishment of "a branch factory, office or storeroom within the state of New York." § 3(37).

Juanita Swedenburg and David Lucas, joined by three of their New York customers, brought suit in the Southern District of New York against the officials responsible for administering New York's Alcoholic Beverage Control Law seeking, *inter alia*, a declaration that the State's limitations on the direct shipment of out-of-state wine violate the Commerce Clause. New York liquor wholesalers and repre-

sentatives of New York liquor retailers intervened in support of the State.

The District Court granted summary judgment to the plaintiffs. 232 F. Supp. 2d 135 (2002). The court first determined that, under established Commerce Clause principles, the New York direct-shipment scheme discriminates against out-of-state wineries. *Id.*, at 146–147. The court then rejected the State's Twenty-first Amendment argument, finding that the "[d]efendants have not shown that New York's ban on the direct shipment of out-of-state wine, and particularly the in-state exceptions to the ban, implicate the State's core concerns under the Twenty-first Amendment." *Id.*, at 148.

The Court of Appeals for the Second Circuit reversed. 358 F. 3d 223 (2004). The court "recognize[d] that the physical presence requirement could create substantial dormant Commerce Clause problems if this licensing scheme regulated a commodity other than alcohol." *Id.*, at 238. The court nevertheless sustained the New York statutory scheme because, in the court's view, "New York's desire to ensure accountability through presence is aimed at the regulatory interests directly tied to the importation and transportation of alcohol for use in New York," *ibid.* As such, the New York direct-shipment laws were "within the ambit of the powers granted to states by the Twenty-first Amendment." *Id.*, at 239.

## C

We consolidated these cases and granted certiorari on the following question: " 'Does a State's regulatory scheme that permits in-state wineries directly to ship alcohol to consumers but restricts the ability of out-of-state wineries to do so violate the dormant Commerce Clause in light of § 2 of the Twenty-first Amendment?' " 541 U. S. 1062 (2004).

For ease of exposition, we refer to the respondents from the Michigan challenge (Nos. 03–1116 and 03–1120) and the petitioners in the New York challenge (No. 03–1274) collec-

tively as the wineries. We refer to their opposing parties—
Michigan, New York, and the wholesalers and retailers—
simply as the States.

## II

### A

Time and again this Court has held that, in all but the
narrowest circumstances, state laws violate the Commerce
Clause if they mandate "differential treatment of in-state
and out-of-state economic interests that benefits the former
and burdens the latter." *Oregon Waste Systems, Inc.* v. *De-
partment of Environmental Quality of Ore.*, 511 U. S. 93, 99
(1994). See also *New Energy Co. of Ind.* v. *Limbach,* 486
U. S. 269, 274 (1988). This rule is essential to the founda-
tions of the Union. The mere fact of nonresidence should
not foreclose a producer in one State from access to markets
in other States. *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336
U. S. 525, 539 (1949). States may not enact laws that burden
out-of-state producers or shippers simply to give a competi-
tive advantage to in-state businesses. This mandate "re-
flect[s] a central concern of the Framers that was an immedi-
ate reason for calling the Constitutional Convention: the
conviction that in order to succeed, the new Union would
have to avoid the tendencies toward economic Balkanization
that had plagued relations among the Colonies and later
among the States under the Articles of Confederation."
*Hughes* v. *Oklahoma,* 441 U. S. 322, 325–326 (1979).

The rule prohibiting state discrimination against inter-
state commerce follows also from the principle that States
should not be compelled to negotiate with each other regard-
ing favored or disfavored status for their own citizens.
States do not need, and may not attempt, to negotiate with
other States regarding their mutual economic interests. Cf.
U. S. Const., Art. I, § 10, cl. 3. Rivalries among the States
are thus kept to a minimum, and a proliferation of trade
zones is prevented. See *C & A Carbone, Inc.* v. *Clarkstown,*

511 U. S. 383, 390 (1994) (citing The Federalist No. 22, pp. 143–145 (C. Rossiter ed. 1961) (A. Hamilton); Madison, Vices of the Political System of the United States, in 2 Writings of James Madison 362–363 (G. Hunt ed. 1901)).

Laws of the type at issue in the instant cases contradict these principles. They deprive citizens of their right to have access to the markets of other States on equal terms. The perceived necessity for reciprocal sale privileges risks generating the trade rivalries and animosities, the alliances and exclusivity, that the Constitution and, in particular, the Commerce Clause were designed to avoid. State laws that protect local wineries have led to the enactment of statutes under which some States condition the right of out-of-state wineries to make direct wine sales to in-state consumers on a reciprocal right in the shipping State. California, for example, passed a reciprocity law in 1986, retreating from the State's previous regime that allowed unfettered direct shipments from out-of-state wineries. Riekhof & Sykuta, 27 Regulation, No. 3, at 30. Prior to 1986, all but three States prohibited direct shipments of wine. The obvious aim of the California statute was to open the interstate direct-shipping market for the State's many wineries. *Ibid.* The current patchwork of laws—with some States banning direct shipments altogether, others doing so only for out-of-state wines, and still others requiring reciprocity—is essentially the product of an ongoing, low-level trade war. Allowing States to discriminate against out-of-state wine "invite[s] a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause." *Dean Milk Co.* v. *Madison,* 340 U. S. 349, 356 (1951). See also *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511, 521–523 (1935).

## B

The discriminatory character of the Michigan system is obvious. Michigan allows in-state wineries to ship directly to consumers, subject only to a licensing requirement. Out-

of-state wineries, whether licensed or not, face a complete ban on direct shipment. The differential treatment requires all out-of-state wine, but not all in-state wine, to pass through an in-state wholesaler and retailer before reaching consumers. These two extra layers of overhead increase the cost of out-of-state wines to Michigan consumers. The cost differential, and in some cases the inability to secure a wholesaler for small shipments, can effectively bar small wineries from the Michigan market.

The New York regulatory scheme differs from Michigan's in that it does not ban direct shipments altogether. Out-of-state wineries are instead required to establish a distribution operation in New York in order to gain the privilege of direct shipment. N. Y. ABC Law §§ 3(37), 96 (West Supp. 2005). This, though, is just an indirect way of subjecting out-of-state wineries, but not local ones, to the three-tier system. New York and those allied with its interests defend the scheme by arguing that an out-of-state winery has the same access to the State's consumers as in-state wineries: All wine must be sold through a licensee fully accountable to New York; it just so happens that in order to become a licensee, a winery must have a physical presence in the State. There is some confusion over the precise steps out-of-state wineries must take to gain access to the New York market, in part because no winery has run the State's regulatory gauntlet. New York's argument, in any event, is unconvincing.

The New York scheme grants in-state wineries access to the State's consumers on preferential terms. The suggestion of a limited exception for direct shipment from out-of-state wineries does nothing to eliminate the discriminatory nature of New York's regulations. In-state producers, with the applicable licenses, can ship directly to consumers from their wineries. §§ 76–a(3), 76(4), and 77(2) (West 2000). Out-of-state wineries must open a branch office and warehouse in New York, additional steps that drive up the cost

of their wine. §§ 3(37), 96 (West Supp. 2005). See also App. in No. 03–1274, pp. 159–160 (Affidavit of Thomas G. McKeon, General Counsel to the New York State Liquor Authority). For most wineries, the expense of establishing a bricks-and-mortar distribution operation in 1 State, let alone all 50, is prohibitive. It comes as no surprise that not a single out-of-state winery has availed itself of New York's direct-shipping privilege. We have "viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere." *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 145 (1970). New York's in-state presence requirement runs contrary to our admonition that States cannot require an out-of-state firm "to become a resident in order to compete on equal terms." *Halliburton Oil Well Cementing Co.* v. *Reily*, 373 U. S. 64, 72 (1963). See also *Ward* v. *Maryland*, 12 Wall. 418 (1871).

In addition to its restrictive in-state presence requirement, New York discriminates against out-of-state wineries in other ways. Out-of-state wineries that establish the requisite branch office and warehouse in New York are still ineligible for a "farm winery" license, the license that provides the most direct means of shipping to New York consumers. N. Y. ABC Law § 76–a(5) (West Supp. 2005) ("No licensed farm winery shall manufacture or sell any wine not produced exclusively from grapes or other fruits or agricultural products grown or produced in New York state"). Out-of-state wineries may apply only for a commercial winery license. See §§ 3(37), 76. Unlike farm wineries, however, commercial wineries must obtain a separate certificate from the state liquor authority authorizing direct shipments to consumers, § 77(2) (West 2000); and, of course, for out-of-state wineries there is the additional requirement of maintaining a distribution operation in New York. New York law also allows in-state wineries without direct-shipping licenses to distribute their wine through other wineries that have the

applicable licenses. § 76(5) (West Supp. 2005). This is another privilege not afforded out-of-state wineries.

We have no difficulty concluding that New York, like Michigan, discriminates against interstate commerce through its direct-shipping laws.

## III

State laws that discriminate against interstate commerce face "a virtually *per se* rule of invalidity." *Philadelphia* v. *New Jersey*, 437 U. S. 617, 624 (1978). The Michigan and New York laws by their own terms violate this proscription. The two States, however, contend their statutes are saved by § 2 of the Twenty-first Amendment, which provides:

> "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

The States' position is inconsistent with our precedents and with the Twenty-first Amendment's history. Section 2 does not allow States to regulate the direct shipment of wine on terms that discriminate in favor of in-state producers.

### A

Before 1919, the temperance movement fought to curb the sale of alcoholic beverages one State at a time. The movement made progress, and many States passed laws restricting or prohibiting the sale of alcohol. This Court upheld state laws banning the production and sale of alcoholic beverages, *Mugler* v. *Kansas*, 123 U. S. 623 (1887), but was less solicitous of laws aimed at imports. In a series of cases before ratification of the Eighteenth Amendment the Court, relying on the Commerce Clause, invalidated a number of state liquor regulations.

These cases advanced two distinct principles. First, the Court held that the Commerce Clause prevented States from discriminating against imported liquor. *Scott* v. *Donald,*

165 U. S. 58 (1897); *Walling* v. *Michigan,* 116 U. S. 446 (1886); *Tiernan* v. *Rinker,* 102 U. S. 123 (1880). In *Walling,* for example, the Court invalidated a Michigan tax that discriminated against liquor imports by exempting sales of local products. The Court held that States were not free to pass laws burdening only out-of-state products:

> "A discriminating tax imposed by a State operating to the disadvantage of the products of other States when introduced into the first mentioned State, is, in effect, a regulation in restraint of commerce among the States, and as such is a usurpation of the power conferred by the Constitution upon the Congress of the United States." 116 U. S., at 455.

Second, the Court held that the Commerce Clause prevented States from passing facially neutral laws that placed an impermissible burden on interstate commerce. *Rhodes* v. *Iowa,* 170 U. S. 412 (1898); *Vance* v. *W. A. Vandercook Co.,* 170 U. S. 438 (1898); *Leisy* v. *Hardin,* 135 U. S. 100 (1890); *Bowman* v. *Chicago & Northwestern R. Co.,* 125 U. S. 465 (1888). For example, in *Bowman,* the Court struck down an Iowa statute that required all liquor importers to have a permit. *Bowman* and its progeny rested in part on the since-rejected original-package doctrine. Under this doctrine goods shipped in interstate commerce were immune from state regulation while in their original package. As the Court explained in *Vance:*

> "[T]he power to ship merchandise from one State into another carries with it, as an incident, the right in the receiver of the goods to sell them in the original packages, any state regulation to the contrary notwithstanding; that is to say, that the goods received by Interstate Commerce remain under the shelter of the Interstate Commerce clause of the Constitution, until by a sale in the original package they have been commingled with

the general mass of property in the State." 170 U. S., at 444–445.

*Bowman* reserved the question whether a State could ban the sale of imported liquor altogether. 125 U. S., at 499–500. Iowa responded to *Bowman* by doing just that but was thwarted once again. In *Leisy, supra,* the Court held that Iowa could not ban the sale of imported liquor in its original package.

*Leisy* left the States in a bind. They could ban the production of domestic liquor, *Mugler, supra,* but these laws were ineffective because out-of-state liquor was immune from any state regulation as long as it remained in its original package, *Leisy, supra.* To resolve the matter, Congress passed the Wilson Act (so named for Senator Wilson of Iowa), which empowered the States to regulate imported liquor on the same terms as domestic liquor:

> "That all fermented, distilled, or other intoxicating liquors or liquids transported into any State or Territory or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise." Ch. 728, 26 Stat. 313 (codified at 27 U. S. C. § 121).

By its own terms, the Wilson Act did not allow States to discriminate against out-of-state liquor; rather, it allowed States to regulate imported liquor only "to the same extent and in the same manner" as domestic liquor.

The Court confirmed this interpretation in *Scott, supra.* *Scott* involved a constitutional challenge to South Carolina's dispensary law, 1895 S. C. Acts p. 721, which required that

all liquor sales be channeled through the state liquor commissioner. 165 U. S., at 92. The statute discriminated against out-of-state manufacturers in two primary ways. First, § 15 required the commissioner to "purchase his supplies from the brewers and distillers in this State when their product reaches the standard required by this Act: Provided, Such supplies can be purchased as cheaply from such brewers and distillers in this State as elsewhere." 1895 S. C. Acts p. 732. Second, § 23 of the statute limited the State's markup on locally produced wines to a 10-percent profit but provided "no such limitation of charge in the case of imported wines." 165 U. S., at 93. Based on these discriminatory provisions, the Court rejected the argument that the South Carolina dispensary law was authorized by the Wilson Act. *Id.*, at 100. It explained that the Wilson Act was "not intended to confer upon any State the power to discriminate injuriously against the products of other States in articles whose manufacture and use are not forbidden, and which are therefore the subjects of legitimate commerce." *Ibid.* To the contrary, the Court said, the Wilson Act mandated "equality or uniformity of treatment under state laws," *ibid.*, and did not allow South Carolina to provide "an unjust preference" to its products "as against similar products of the other States," *id.*, at 101. The dissent also understood the validity of the dispensary law to turn in large part on §§ 15 and 23, but argued that even if these provisions were discriminatory the correct remedy was to sever them from the rest of the Act. *Id.*, at 104–106 (opinion of Brown, J.).

Although the Wilson Act increased the States' authority to police liquor imports, it did not solve all their problems. In *Vance* and *Rhodes*—two cases decided soon after *Scott*— the Court made clear that the Wilson Act did not authorize States to prohibit direct shipments for personal use. In *Vance*, the Court characterized *Scott* as embodying two distinct holdings: First, the South Carolina dispensary law "amount[ed] to an unjust discrimination against liquors, the

products of other States." 170 U. S., at 442. This aspect of the *Scott* holding, which confirmed the Wilson Act's nondiscrimination principle, was based "on particular provisions of the law by which the discrimination was brought about." 170 U. S., at 442. Second, "in so far as the law then in question forbade the sending . . . of intoxicating liquors for the use of the person to whom it was shipped, the statute was repugnant to [the Commerce Clause]." *Ibid.* (citing *Scott*, 165 U. S. 58). See also 170 U. S., at 443 (distinguishing between the provisions at issue in *Scott* "which were held to operate a discrimination" and those which barred direct shipment for personal use).

This second holding, that consumers had the right to receive alcoholic beverages shipped in interstate commerce for personal use, was only implicit in *Scott*. 165 U. S., at 78, 99–100. The Court expanded on this point, however, not only in *Vance* but again in *Rhodes*. *Rhodes* construed the Wilson Act narrowly to avoid interference with this right. The Act, the Court said, authorized States to regulate only the resale of imported liquor, not direct shipment to consumers for personal use. 170 U. S., at 421. Without a clear indication from Congress that it intended to allow States to ban such shipments, the *Rhodes* Court read the words "upon arrival" in the Wilson Act as authorizing "the power of the State to attach to an interstate commerce shipment," only after its arrival at the point of destination and delivery there to the consignee." *Id.*, at 426. See also *id.*, at 424; *Bridenbaugh* v. *Freeman-Wilson*, 227 F. 3d 848, 852 (CA7 2000). The Court interpreted the Wilson Act to overturn *Leisy* but leave *Bowman* intact. *Rhodes, supra*, at 423–424. The right to regulate did not attach until the liquor was in the hands of the customer. As a result, the mail-order liquor trade continued to thrive. Rogers, Interstate Commerce in Intoxicating Liquors Before the Webb-Kenyon Act, 4 Va. L. Rev. 353, 364–365 (1917).

After considering a series of bills in response to the Court's reading of the Wilson Act, Congress responded to the direct-shipment loophole in 1913 by enacting the Webb-Kenyon Act, 37 Stat. 699, 27 U. S. C. § 122. See Rogers, *supra*, at 363–370. The Act, entitled "An Act Divesting intoxicating liquors of their interstate character in certain cases," provides:

> "That the shipment or transportation . . . of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one State . . . into any other State . . . which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State . . . is hereby prohibited." 37 Stat., at 699–700.

The constitutionality of the Webb-Kenyon Act itself was in doubt. *Vance* and *Rhodes* implied that any law authorizing the States to regulate direct shipments for personal use would be an unlawful delegation of Congress' Commerce Clause powers. Indeed, President Taft, acting on the advice of Attorney General Wickersham, vetoed the Act for this specific reason. S. Rep. No. 103, 63d Cong., 1st Sess., 3–6 (1913); 30 Op. Atty. Gen. 88 (1913). Congress overrode the veto and in *Clark Distilling Co.* v. *Western Maryland R. Co.*, 242 U. S. 311 (1917), a divided Court upheld the Webb-Kenyon Act against a constitutional challenge.

The Court construed the Act to close the direct-shipment gap left open by the Wilson Act. States were now empowered to forbid shipments of alcohol to consumers for personal use, provided that the States treated in-state and out-of-state liquor on the same terms. *Id.*, at 321–322 (noting that the West Virginia law at issue in *Clark Distilling* "forbade the shipment into or transportation of liquor in the State whether from inside or out"). The Court understood that

the Webb-Kenyon Act "was enacted simply to extend that which was done by the Wilson Act." *Id.*, at 324. The Act's purpose "was to prevent the immunity characteristic of interstate commerce from being used to permit the receipt of liquor through such commerce in States contrary to their laws, and thus in effect afford a means by subterfuge and indirection to set such laws at naught." *Ibid.* The Court thus recognized that the Act was an attempt to eliminate the regulatory advantage, *i. e.*, its immunity characteristic, afforded imported liquor under *Bowman* and *Rhodes*.

Michigan and New York now argue the Webb-Kenyon Act went even further and removed any barrier to discriminatory state liquor regulations. We do not agree. First, this reading of the Webb-Kenyon Act conflicts with that given the statute in *Clark Distilling. Clark Distilling* recognized that the Webb-Kenyon Act extended the Wilson Act to allow the States to intercept liquor shipments before those shipments reached the consignee. The States' contention that the Webb-Kenyon Act also reversed the Wilson Act's prohibition on discriminatory treatment of out-of-state liquors cannot be reconciled with *Clark Distilling*'s description of the Webb-Kenyon Act's purpose—"simply to extend that which was done by the Wilson Act." 242 U. S., at 324. See also *McCormick & Co.* v. *Brown*, 286 U. S. 131, 140–141 (1932).

The statute's text does not compel a different result. The Webb-Kenyon Act readily can be construed as forbidding "shipment or transportation" only where it runs afoul of the State's generally applicable laws governing receipt, possession, sale, or use. Cf. *id.*, at 141 (noting that the Act authorized enforcement of "valid" state laws). At the very least, the Webb-Kenyon Act expresses no clear congressional intent to depart from the principle, unexceptional at the time the Act was passed and still applicable today, *Hillside Dairy Inc.* v. *Lyons*, 539 U. S. 59, 66 (2003), that discrimination against out-of-state goods is disfavored. Cf. *Western &*

*Southern Life Ins. Co.* v. *State Bd. of Equalization of Cal.,* 451 U. S. 648, 652–653 (1981) (holding that the McCarran-Ferguson Act, 15 U. S. C. § 1011 *et seq.,* removed all dormant Commerce Clause scrutiny of state insurance laws; § 1011 provides: "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States").

Last, and most importantly, the Webb-Kenyon Act did not purport to repeal the Wilson Act, which expressly precludes States from discriminating. If Congress' aim in passing the Webb-Kenyon Act was to authorize States to discriminate against out-of-state goods then its first step would have been to repeal the Wilson Act. It did not do so. There is no inconsistency between the Wilson Act and the Webb-Kenyon Act sufficient to warrant an inference that the latter repealed the former. See *Washington* v. *Miller,* 235 U. S. 422, 428 (1914) (noting that implied repeals are disfavored). Indeed, this Court has twice noted that the Wilson Act remains in effect today. *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.,* 377 U. S. 324, 333, n. 11 (1964); *Department of Revenue* v. *James B. Beam Distilling Co.,* 377 U. S. 341, 345, n. 7 (1964). See 27 U. S. C. § 121.

The Wilson Act reaffirmed, and the Webb-Kenyon Act did not displace, the Court's line of Commerce Clause cases striking down state laws that discriminated against liquor produced out of state. The rule of *Tiernan, Walling,* and *Scott* remained in effect: States were required to regulate domestic and imported liquor on equal terms. "[T]he intent of . . . the Webb-Kenyon Act . . . was to take from intoxicating liquor the protection of the interstate commerce laws in so far as necessary to deny them an advantage over the intoxicating liquors produced in the state into which they were brought, yet, [the Act does not] show an intent or purpose to

so abdicate control over interstate commerce as to permit discrimination against the intoxicating liquor brought into one state from another." *Pacific Fruit & Produce Co.* v. *Martin*, 16 F. Supp. 34, 39–40 (WD Wash. 1936). See also Friedman, Constitutional Law: State Regulation of Importation of Intoxicating Liquor Under Twenty-first Amendment, 21 Cornell L. Q. 504, 509 (1936) ("The cases under the Webb-Kenyon Act uphold state prohibition and regulation in the exercise of the police power yet they clearly forbid laws which discriminate arbitrarily and unreasonably against liquor produced outside of the state" (footnote omitted)).

### B

The ratification of the Eighteenth Amendment in 1919 provided a brief respite from the legal battles over the validity of state liquor regulations. With the ratification of the Twenty-first Amendment 14 years later, however, nationwide Prohibition came to an end. Section 1 of the Twenty-first Amendment repealed the Eighteenth Amendment. Section 2 of the Twenty-first Amendment is at issue here.

Michigan and New York say the provision grants to the States the authority to discriminate against out-of-state goods. The history we have recited does not support this position. To the contrary, it provides strong support for the view that § 2 restored to the States the powers they had under the Wilson and Webb-Kenyon Acts. "The wording of § 2 of the Twenty-first Amendment closely follows the Webb-Kenyon and Wilson Acts, expressing the framers' clear intention of constitutionalizing the Commerce Clause framework established under those statutes." *Craig* v. *Boren*, 429 U. S. 190, 205–206 (1976) (footnote omitted).

The aim of the Twenty-first Amendment was to allow States to maintain an effective and uniform system for controlling liquor by regulating its transportation, importation, and use. The Amendment did not give States the authority to pass nonuniform laws in order to discriminate against

out-of-state goods, a privilege they had not enjoyed at any earlier time.

Some of the cases decided soon after ratification of the Twenty-first Amendment did not take account of this history and were inconsistent with this view. In *State Bd. of Equalization of Cal.* v. *Young's Market Co.*, 299 U. S. 59, 62 (1936), for example, the Court rejected the argument that the Amendment did not authorize discrimination:

> "The plaintiffs ask us to limit this broad command [of § 2]. They request us to construe the Amendment as saying, in effect: The State may prohibit the importation of intoxicating liquors provided it prohibits the manufacture and sale within its borders; but if it permits such manufacture and sale, it must let imported liquors compete with the domestic on equal terms. To say that, would involve not a construction of the Amendment, but a rewriting of it."

The Court reaffirmed the States' broad powers under § 2 in a series of cases, see *Mahoney* v. *Joseph Triner Corp.*, 304 U. S. 401 (1938); *Indianapolis Brewing Co.* v. *Liquor Control Comm'n*, 305 U. S. 391 (1939); *Ziffrin, Inc.* v. *Reeves*, 308 U. S. 132 (1939); *Joseph S. Finch & Co.* v. *McKittrick*, 305 U. S. 395 (1939), and unsurprisingly many States used the authority bestowed on them by the Court to expand trade barriers. T. Green, Liquor Trade Barriers: Obstructions to Interstate Commerce in Wine, Beer, and Distilled Spirits 4, and App. I (1940) (stating in the wake of *Young's Market* that "[r]ivalries and reprisals have thus flared up").

It is unclear whether the broad language in *Young's Market* was necessary to the result because the Court also stated that "the case [did] not present a question of discrimination prohibited by the commerce clause." 299 U. S., at 62. The Court also declined, contrary to the approach we take today, to consider the history underlying the Twenty-first Amendment. *Id.*, at 63–64. This reluctance did not, however, re-

flect a consensus that such evidence was irrelevant or that prior history was unsupportive of the principle that the Amendment did not authorize discrimination against out-of-state liquors. There was ample opinion to the contrary. See, e. g., *Young's Market Co.* v. *State Bd. of Equalization of Cal.*, 12 F. Supp. 140 (SD Cal. 1935) *(per curiam)*, rev'd, 299 U. S. 59 (1936); *Pacific Fruit & Produce Co.* v. *Martin, supra,* at 39; *Joseph Triner Corp.* v. *Arundel,* 11 F. Supp. 145, 146–147 (Minn. 1935); Friedman, *supra,* at 511–512; Note, Recent Cases, Twenty-first Amendment—Commerce Clause, 85 U. Pa. L. Rev. 322, 323 (1937); W. Hamilton, Price and Price Policies 426 (1938); Note, Legislation, Liquor Control, 38 Colum. L. Rev. 644, 658 (1938); Wiser & Arledge, Does the Repeal Amendment Empower a State to Erect Tariff Barriers and Disregard the Equal Protection Clause in Legislating on Intoxicating Liquors in Interstate Commerce? 7 Geo. Wash. L. Rev. 402, 407–409 (1939); De Ganahl, The Scope of Federal Power Over Alcoholic Beverages Since the Twenty-first Amendment, 8 Geo. Wash. L. Rev. 819, 822–828 (1940); Note, 55 Yale L. J. 815, 819–820 (1946).

Our more recent cases, furthermore, confirm that the Twenty-first Amendment does not supersede other provisions of the Constitution and, in particular, does not displace the rule that States may not give a discriminatory preference to their own producers.

## C

The modern § 2 cases fall into three categories.

First, the Court has held that state laws that violate other provisions of the Constitution are not saved by the Twenty-first Amendment. The Court has applied this rule in the context of the First Amendment, *44 Liquormart, Inc.* v. *Rhode Island,* 517 U. S. 484 (1996); the Establishment Clause, *Larkin* v. *Grendel's Den, Inc.,* 459 U. S. 116 (1982); the Equal Protection Clause, *Craig, supra,* at 204–209; the Due Process Clause, *Wisconsin* v. *Constantineau,* 400 U. S.

433 (1971); and the Import-Export Clause, *Department of Revenue* v. *James B. Beam Distilling Co.*, 377 U. S. 341 (1964).

Second, the Court has held that § 2 does not abrogate Congress' Commerce Clause powers with regard to liquor. *Capital Cities Cable, Inc.* v. *Crisp*, 467 U. S. 691 (1984); *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980). The argument that "the Twenty-first Amendment has somehow operated to 'repeal' the Commerce Clause" for alcoholic beverages has been rejected. *Hostetter*, 377 U. S., at 331–332. Though the Court's language in *Hostetter* may have come uncommonly close to hyperbole in describing this argument as "an absurd oversimplification," "patently bizarre," and "demonstrably incorrect," *ibid.*, the basic point was sound.

Finally, and most relevant to the issue at hand, the Court has held that state regulation of alcohol is limited by the nondiscrimination principle of the Commerce Clause. *Bacchus*, 468 U. S., at 276; *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U. S. 573 (1986); *Healy* v. *Beer Institute*, 491 U. S. 324 (1989). "When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry." *Brown-Forman, supra*, at 579.

*Bacchus* provides a particularly telling example of this proposition. At issue was an excise tax enacted by Hawaii that exempted certain alcoholic beverages produced in that State. The Court rejected the argument that Hawaii's discrimination against out-of-state liquor was authorized by the Twenty-first Amendment. 468 U. S., at 274–276. "The central purpose of the [Amendment] was not to empower States to favor local liquor industries by erecting barriers to competition." *Id.*, at 276. Despite attempts to distinguish it in the instant cases, *Bacchus* forecloses any contention that § 2

of the Twenty-first Amendment immunizes discriminatory direct-shipment laws from Commerce Clause scrutiny. See also *Brown-Forman, supra,* at 576 (invalidating a New York price affirmation statute that required producers to limit the price of liquor based on the lowest price they offered out of state); *Healy,* 491 U. S., at 328 (invalidating a similar Connecticut statute); *id.,* at 344 (SCALIA, J., concurring in part and concurring in judgment) ("The Connecticut statute's invalidity is fully established by its facial discrimination against interstate commerce . . . . This is so despite the fact that the law regulates the sale of alcoholic beverages, since its discriminatory character eliminates the immunity afforded by the Twenty-first Amendment").

Recognizing that *Bacchus* is fatal to their position, the States suggest it should be overruled or limited to its facts. As the foregoing analysis makes clear, we decline their invitation. Furthermore, *Bacchus* does not stand alone in recognizing that the Twenty-first Amendment did not give the States complete freedom to regulate where other constitutional principles are at stake. A retreat from *Bacchus* would also undermine *Brown-Forman* and *Healy.* These cases invalidated state liquor regulations under the Commerce Clause. Indeed, *Healy* explicitly relied on the discriminatory character of the Connecticut price affirmation statute. 491 U. S., at 340–341. *Brown-Forman* and *Healy* lend significant support to the conclusion that the Twenty-first Amendment does not immunize all laws from Commerce Clause challenge.

The States argue that any decision invalidating their direct-shipment laws would call into question the constitutionality of the three-tier system. This does not follow from our holding. "The Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system." *Midcal, supra,* at 110. A State which chooses to ban the sale and consumption of alcohol

altogether could bar its importation; and, as our history shows, it would have to do so to make its laws effective. States may also assume direct control of liquor distribution through state-run outlets or funnel sales through the three-tier system. We have previously recognized that the three-tier system itself is "unquestionably legitimate." *North Dakota* v. *United States*, 495 U. S., at 432. See also *id.*, at 447 (SCALIA, J., concurring in judgment) ("The Twenty-first Amendment . . . empowers North Dakota to require that all liquor sold for use in the State be purchased from a licensed in-state wholesaler"). State policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent. The instant cases, in contrast, involve straightforward attempts to discriminate in favor of local producers. The discrimination is contrary to the Commerce Clause and is not saved by the Twenty-first Amendment.

## IV

Our determination that the Michigan and New York direct-shipment laws are not authorized by the Twenty-first Amendment does not end the inquiry. We still must consider whether either state regime "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of Ind.*, 486 U. S., at 278. The States offer two primary justifications for restricting direct shipments from out-of-state wineries: keeping alcohol out of the hands of minors and facilitating tax collection. We consider each in turn.

The States, aided by several *amici*, claim that allowing direct shipment from out-of-state wineries undermines their ability to police underage drinking. Minors, the States argue, have easy access to credit cards and the Internet and are likely to take advantage of direct wine shipments as a means of obtaining alcohol illegally.

The States provide little evidence that the purchase of wine over the Internet by minors is a problem. Indeed, there is some evidence to the contrary. A recent study by the staff of the FTC found that the 26 States currently allowing direct shipments report no problems with minors' increased access to wine. FTC Report 34. This is not surprising for several reasons. First, minors are less likely to consume wine, as opposed to beer, wine coolers, and hard liquor. *Id.*, at 12. Second, minors who decide to disobey the law have more direct means of doing so. Third, direct shipping is an imperfect avenue of obtaining alcohol for minors who, in the words of the past president of the National Conference of State Liquor Administrators, "'want instant gratification.'" *Id.*, at 33, and n. 137 (explaining why minors rarely buy alcohol via the mail or the Internet). Without concrete evidence that direct shipping of wine is likely to increase alcohol consumption by minors, we are left with the States' unsupported assertions. Under our precedents, which require the "clearest showing" to justify discriminatory state regulation, *C & A Carbone, Inc.*, 511 U. S., at 393, this is not enough.

Even were we to credit the States' largely unsupported claim that direct shipping of wine increases the risk of underage drinking, this would not justify regulations limiting only out-of-state direct shipments. As the wineries point out, minors are just as likely to order wine from in-state producers as from out-of-state ones. Michigan, for example, already allows its licensed retailers (over 7,000 of them) to deliver alcohol directly to consumers. Michigan counters that it has greater regulatory control over in-state producers than over out-of-state wineries. This does not justify Michigan's discriminatory ban on direct shipping. Out-of-state wineries face the loss of state and federal licenses if they fail to comply with state law. This provides strong incentives not to sell alcohol to minors. In addition, the States can take less restrictive steps to minimize the risk that minors

will order wine by mail. For example, the Model Direct Shipping Bill developed by the National Conference of State Legislatures requires an adult signature on delivery and a label so instructing on each package.

The States' tax-collection justification is also insufficient. Increased direct shipping, whether originating in state or out of state, brings with it the potential for tax evasion. With regard to Michigan, however, the tax-collection argument is a diversion. That is because Michigan, unlike many other States, does not rely on wholesalers to collect taxes on wines imported from out of state. Instead, Michigan collects taxes directly from out-of-state wineries on all wine shipped to in-state wholesalers. Mich. Admin. Code Rule 436.1725(2) (1989) ("Each outside seller of wine shall submit . . . a wine tax report of all wine sold, delivered, or imported into this state during the preceding calendar month"). If licensing and self-reporting provide adequate safeguards for wine distributed through the three-tier system, there is no reason to believe they will not suffice for direct shipments.

New York and its supporting parties also advance a tax-collection justification for the State's direct-shipment laws. While their concerns are not wholly illusory, their regulatory objectives can be achieved without discriminating against interstate commerce. In particular, New York could protect itself against lost tax revenue by requiring a permit as a condition of direct shipping. This is the approach taken by New York for in-state wineries. The State offers no reason to believe the system would prove ineffective for out-of-state wineries. Licensees could be required to submit regular sales reports and to remit taxes. Indeed, various States use this approach for taxing direct interstate wine shipments, e. g., N. H. Rev. Stat. Ann. § 178.27 (Lexis Supp. 2004), and report no problems with tax collection. See FTC Report 38–40. This is also the procedure sanctioned by the National Conference of State Legislatures in their Model Direct

Shipping Bill. See, *e. g.*, S. C. Code Ann. § 61–4–747(C) (West Supp. 2004).

Michigan and New York benefit, furthermore, from provisions of federal law that supply incentives for wineries to comply with state regulations. The Tax and Trade Bureau (formerly the Bureau of Alcohol, Tobacco and Firearms) has authority to revoke a winery's federal license if it violates state law. BATF Industry Circular 96–3 (1997). Without a federal license, a winery cannot operate in any State. See 27 U. S. C. § 204. In addition the Twenty-first Amendment Enforcement Act gives state attorneys general the power to sue wineries in federal court to enjoin violations of state law. § 122a(b).

These federal remedies, when combined with state licensing regimes, adequately protect States from lost tax revenue. The States have not shown that tax evasion from out-of-state wineries poses such a unique threat that it justifies their discriminatory regimes.

Michigan and New York offer a handful of other rationales, such as facilitating orderly market conditions, protecting public health and safety, and ensuring regulatory accountability. These objectives can also be achieved through the alternative of an evenhanded licensing requirement. FTC Report 40–41. Finally, it should be noted that improvements in technology have eased the burden of monitoring out-of-state wineries. Background checks can be done electronically. Financial records and sales data can be mailed, faxed, or submitted via e-mail.

In summary, the States provide little concrete evidence for the sweeping assertion that they cannot police direct shipments by out-of-state wineries. Our Commerce Clause cases demand more than mere speculation to support discrimination against out-of-state goods. The "burden is on the State to show that 'the *discrimination* is demonstrably justified,'" *Chemical Waste Management, Inc.* v. *Hunt,* 504 U. S. 334, 344 (1992) (emphasis in original). The Court has

upheld state regulations that discriminate against interstate commerce only after finding, based on concrete record evidence, that a State's nondiscriminatory alternatives will prove unworkable. See, *e. g., Maine* v. *Taylor*, 477 U. S. 131, 141–144 (1986). Michigan and New York have not satisfied this exacting standard.

## V

States have broad power to regulate liquor under §2 of the Twenty-first Amendment. This power, however, does not allow States to ban, or severely limit, the direct shipment of out-of-state wine while simultaneously authorizing direct shipment by in-state producers. If a State chooses to allow direct shipment of wine, it must do so on evenhanded terms. Without demonstrating the need for discrimination, New York and Michigan have enacted regulations that disadvantage out-of-state wine producers. Under our Commerce Clause jurisprudence, these regulations cannot stand.

We affirm the judgment of the Court of Appeals for the Sixth Circuit; and we reverse the judgment of the Court of Appeals for the Second Circuit and remand the case for further proceedings consistent with our opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE O'CONNOR joins, dissenting.

Congress' power to regulate commerce among the States includes the power to authorize the States to place burdens on interstate commerce. *Prudential Ins. Co.* v. *Benjamin*, 328 U. S. 408 (1946). Absent such congressional approval, a state law may violate the unwritten rules described as the "dormant Commerce Clause" either by imposing an undue burden on both out-of-state and local producers engaged in interstate activities or by treating out-of-state producers less favorably than their local competitors. See, *e. g., Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970); *Philadelphia* v.

494

*New Jersey,* 437 U. S. 617 (1978). A state law totally prohibiting the sale of an ordinary article of commerce might impose an even more serious burden on interstate commerce. If Congress may nevertheless authorize the States to enact such laws, surely the people may do so through the process of amending our Constitution.

The New York and Michigan laws challenged in these cases would be patently invalid under well-settled dormant Commerce Clause principles if they regulated sales of an ordinary article of commerce rather than wine. But ever since the adoption of the Eighteenth Amendment and the Twenty-first Amendment, our Constitution has placed commerce in alcoholic beverages in a special category. Section 2 of the Twenty-first Amendment expressly provides that "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

Today many Americans, particularly those members of the younger generations who make policy decisions, regard alcohol as an ordinary article of commerce, subject to substantially the same market and legal controls as other consumer products. That was definitely not the view of the generations that made policy in 1919 when the Eighteenth Amendment was ratified or in 1933 when it was repealed by the Twenty-first Amendment.[1] On the contrary, the moral condemnation of the use of alcohol as a beverage represented

---

[1] In the words of Justice Jackson: "The people of the United States knew that liquor is a lawlessness unto itself. They determined that it should be governed by a specific and particular Constitutional provision. They did not leave it to the courts to devise special distortions of the general rules as to interstate commerce to curb liquor's 'tendency to get out of legal bounds.' It was their unsatisfactory experience with that method that resulted in giving liquor an exclusive place in constitutional law as a commodity whose transportation is governed by a special, constitutional provision." *Duckworth* v. *Arkansas,* 314 U. S. 390, 398–399 (1941) (opinion concurring in result).

not merely the convictions of our religious leaders, but the views of a sufficiently large majority of the population to warrant the rare exercise of the power to amend the Constitution on two occasions. The Eighteenth Amendment entirely prohibited commerce in "intoxicating liquors" for beverage purposes throughout the United States and the territories subject to its jurisdiction. While § 1 of the Twenty-first Amendment repealed the nationwide prohibition, § 2 gave the States the option to maintain equally comprehensive prohibitions in their respective jurisdictions.

The views of judges who lived through the debates that led to the ratification of those Amendments are entitled to special deference. Foremost among them was Justice Brandeis, whose understanding of a State's right to discriminate in its regulation of out-of-state alcohol could not have been clearer:

> "The plaintiffs ask us to limit [§ 2's] broad command. They request us to construe the Amendment as saying, in effect: The State may prohibit the importation of intoxicating liquors provided it prohibits the manufacture and sale within its borders; but if it permits such manufacture and sale, it must let imported liquors compete with the domestic on equal terms. To say that, would involve not a construction of the Amendment, but a rewriting of it. . . . Can it be doubted that a State might establish a state monopoly of the manufacture and sale of beer, and either prohibit all competing importations, or discourage importation by laying a heavy impost, or channelize desired importations by confining them to a single consignee?" *State Bd. of Equalization of Cal.* v. *Young's Market Co.*, 299 U. S. 59, 62–63 (1936).[2]

---

[2] According to Justice Black, who participated in the passage of the Twenty-first Amendment in the Senate, § 2 was intended to return "'absolute control' of liquor traffic to the States, free of all restrictions which the Commerce Clause might before that time have imposed." *Hostetter*

In the years following the ratification of the Twenty-first Amendment, States adopted manifold laws regulating commerce in alcohol, and many of these laws were discriminatory.[3] So-called "dry states" entirely prohibited such commerce; others prohibited the sale of alcohol on Sundays; others permitted the sale of beer and wine but not hard liquor; most created either state monopolies or distribution systems that gave discriminatory preferences to local retailers and distributors. The notion that discriminatory state laws violated the unwritten prohibition against balkanizing the American economy—while persuasive in contemporary times when alcohol is viewed as an ordinary article of commerce—would have seemed strange indeed to the millions of Americans who condemned the use of the "demon rum" in the 1920's and 1930's. Indeed, they expressly authorized the "balkanization" that today's decision condemns. Today's decision may represent sound economic policy and may be consistent with the policy choices of the contemporaries of Adam Smith who drafted our original Constitution;[4] it is not, however, consistent with the policy choices made by those who amended our Constitution in 1919 and 1933.

My understanding (and recollection) of the historical context reinforces my conviction that the text of §2 should be "broadly and colloquially interpreted." *Carter* v. *Virginia,* 321 U. S. 131, 141 (1944) (Frankfurter, J., concurring).[5]  In-

---

v. *Idlewild Bon Voyage Liquor Corp.,* 377 U. S. 324, 338 (1964) (dissenting opinion).

[3] See generally Green, Interstate Barriers in the Alcoholic Beverage Field, 7 Law & Contemp. Prob. 717 (1940); *post,* at 517–520 (THOMAS, J., dissenting).

[4] Cf. *Knickerbocker Ice Co.* v. *Stewart,* 253 U. S. 149, 169 (1920) (Holmes, J., dissenting) ("I cannot for a moment believe that apart from the Eighteenth Amendment special constitutional principles exist against strong drink. The fathers of the Constitution so far as I know approved it").

[5] As he added in that case, "since Virginia derives the power to legislate as she did from the Twenty-first Amendment, the Commerce Clause does not come into play." *Carter* v. *Virginia,* 321 U. S., at 143.

deed, the fact that the Twenty-first Amendment was the only Amendment in our history to have been ratified by the people in state conventions, rather than by state legislatures, provides further reason to give its terms their ordinary meaning. Because the New York and Michigan laws regulate the "transportation or importation" of "intoxicating liquors" for "delivery or use therein," they are exempt from dormant Commerce Clause scrutiny.

As JUSTICE THOMAS has demonstrated, the text of the Twenty-first Amendment is a far more reliable guide to its meaning than the unwritten rules that the majority enforces today. I therefore join his persuasive and comprehensive dissenting opinion.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE, JUSTICE STEVENS, and JUSTICE O'CONNOR join, dissenting.

A century ago, this Court repeatedly invalidated, as inconsistent with the negative Commerce Clause, state liquor legislation that prevented out-of-state businesses from shipping liquor directly to a State's residents. The Webb-Kenyon Act and the Twenty-first Amendment cut off this intrusive review, as their text and history make clear and as this Court's early cases on the Twenty-first Amendment recognized. The Court today seizes back this power, based primarily on a historical argument that this Court decisively rejected long ago in *State Bd. of Equalization of Cal.* v. *Young's Market Co.*, 299 U. S. 59, 64 (1936). Because I would follow *Young's Market* and the language of both the statute that Congress enacted and the Amendment that the Nation ratified, rather than the Court's questionable reading of history and the "negative implications" of the Commerce Clause, I respectfully dissent.

I

The Court devotes much attention to the Twenty-first Amendment, yet little to the terms of the Webb-Kenyon Act. This is a mistake, because that Act's language displaces any

negative Commerce Clause barrier to state regulation of liquor sales to in-state consumers.

## A

The Webb-Kenyon Act immunizes from negative Commerce Clause review the state liquor laws that the Court holds are unconstitutional. The Act "prohibit[s]" any "shipment or transportation" of alcoholic beverages "into any State" when those beverages are "intended, by any person interested therein, to be received, possessed, sold, or in any manner used . . . in violation of any law of such State."[1] State laws that regulate liquor imports in the manner described by the Act are exempt from judicial scrutiny under the negative Commerce Clause, as this Court has long held. See *McCormick & Co.* v. *Brown*, 286 U. S. 131, 139–140 (1932); *Clark Distilling Co.* v. *Western Maryland R. Co.*, 242 U. S. 311, 324 (1917); *Seaboard Air Line R. Co.* v. *North Carolina*, 245 U. S. 298, 303–304 (1917). The Webb-Kenyon Act's language, in other words, "prevent[s] the immunity characteristic of interstate commerce from being used to permit the receipt of liquor through such commerce in States contrary to their laws." *Clark Distilling, supra,* at 324.

---

[1] The Webb-Kenyon Act provides:

"The shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind from one State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, into any other State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, or from any foreign country into any State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, is prohibited." 27 U. S. C. § 122.

The Michigan and New York direct-shipment laws are within the Webb-Kenyon Act's terms and therefore do not run afoul of the negative Commerce Clause. Those laws restrict out-of-state wineries from shipping and selling wine directly to Michigan and New York consumers. *Ante,* at 469, 470. Any winery that ships wine directly to a Michigan or New York consumer in violation of those state-law restrictions is a "person interested therein" "intend[ing]" to "s[ell]" wine "in violation of" Michigan and New York law, and thus comes within the terms of the Webb-Kenyon Act.

This construction of the Webb-Kenyon Act is no innovation. The Court adopted this reading of the Act in *McCormick & Co.* v. *Brown, supra,* and Congress approved it shortly thereafter in 1935 when it reenacted the Act without alteration, 49 Stat. 877; see, *e. g., Keene Corp.* v. *United States,* 508 U. S. 200, 212–213 (1993) (applying presumption that reenacted statute incorporates settled judicial construction). *McCormick* considered a state law that prohibited out-of-state manufacturers (as well as in-state manufacturers) from shipping liquor to a licensed in-state dealer without first obtaining a wholesaler permit. The Court held that by shipping liquor into the State without a license, the out-of-state manufacturer "[fell] directly within the terms of" the Webb-Kenyon Act, thus violating it. 286 U. S., at 143; see also *Rainier Brewing Co.* v. *Great Northern Pacific S. S. Co.,* 259 U. S. 150, 152–153 (1922) (holding that under the Webb-Kenyon Act, beer importers must "carry" beer into the State "in the manner allowed by the laws of that State"). While the law at issue in *McCormick* did not discriminate against out-of-state products, the construction of the Webb-Kenyon Act it adopted applies equally to state laws that so discriminate. If an out-of-state manufacturer shipping liquor to an in-state distributor without a license "s[ells]" liquor "in violation of any law of such State" within the meaning of Webb-Kenyon, as *McCormick* held, an out-of-state winery directly shipping wine to consumers in violation of even a discrimina-

tory state law does so as well. The Michigan and New York laws are indistinguishable in relevant part from the state law upheld in *McCormick*.[2]

The Court answers that the Webb-Kenyon Act's text "readily can be construed as forbidding 'shipment or transportation' only where it runs afoul of the States' generally applicable laws governing receipt, possession, sale, or use." *Ante*, at 482. What the Court means by "generally applicable" laws is unclear, for the Court concedes that the Webb-Kenyon Act allows States to pass laws discriminating against out-of-state wholesalers. See *ante*, at 484, 488–489. By "generally applicable [state] laws," therefore, the Court apparently means all state laws except for those that "discriminate" against out-of-state liquor products. See *ante*, at 482–484, 488–489.

The Court leaves unexplained how this ad hoc exception follows from the Act's text. The Act's language leaves no room for this exception. The Act does not condition a State's ability to regulate the receipt, possession, and use of liquor free from negative Commerce Clause immunity on the character of the state law. It does not mention "discrimination," much less discrimination against out-of-state liquor products. Instead, it prohibits the interstate shipment of liquor into a State "in violation of any law of such State." 27 U. S. C. § 122. "[A]ny law of such State" means any law, including a "discriminatory" one.

The Court's distinction between discrimination against manufacturers and discrimination against wholesalers is

---

[2] The Court notes that *McCormick* held that the Webb-Kenyon Act only authorized "valid" laws, the suggestion being that *McCormick*'s holding applies only to nondiscriminatory (and hence "valid" laws). *Ante*, at 482. The Court takes this word out of context. By "valid" laws, *McCormick* meant laws not pre-empted by the National Prohibition Act, rather than laws that treated in-state and out-of-state products equally. See 286 U. S., at 143–144 (finding the legislation "valid" because the National Prohibition Act did not pre-empt it).

equally unjustified. There is no warrant in the Act's text for treating regulated entities differently depending on their place in the distribution chain: The Act applies in undifferentiated fashion to "any person interested therein." A wine manufacturer shipping wine directly to a consumer is an interested party, just as an out-of-state liquor wholesaler is.[3]

The contrast between the language of the Webb-Kenyon Act and its predecessor, the Wilson Act, casts still more doubt on the Court's reading. The Wilson Act provided that liquor shipped into a State was "subject to the operation and effect of the laws of such State . . . to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory." § 121. Even if this language does not authorize States to discriminate against out-of-state liquor products, see *ante*, at 478, the Webb-Kenyon Act has no comparable language addressing discrimination. The contrast is telling. It shows that the Webb-Kenyon Act encompasses laws that discriminate against both out-of-state wholesalers and out-of-state manufacturers.

In support of its conclusion that the Webb-Kenyon Act did not authorize States to discriminate, the Court relies heavily on *Clark Distilling Co.* v. *Western Maryland R. Co.*, 242 U. S. 311 (1917). *Ante*, at 481–482. Its reliance is misplaced. *Clark Distilling* held that the Webb-Kenyon Act authorized a nondiscriminatory state law, 242 U. S., at 321–322, and so had no direct occasion to pass on whether the Act also authorized discriminatory laws. Nothing in it implicitly

---

[3] The Court also states that the "Webb-Kenyon Act expresses no clear congressional intent to depart from the principle . . . that discrimination against out-of-state goods is disfavored." *Ante*, at 482. That is not correct. It is settled that the Webb-Kenyon Act explicitly abrogates negative Commerce Clause review of state laws that fall within its terms. See *supra*, at 498–499. There is no reason to require another clear statement for each sort of law to which it might apply. The only question is whether, fairly read, the Webb-Kenyon Act covers Michigan's and New York's direct-shipment laws. As I have explained, it does.

decided that unsettled question in the manner the Court suggests.

To the extent that it is relevant, *Clark Distilling* supports the view that the Webb-Kenyon Act authorized States to discriminate. Contrary to the Court's suggestion, *Clark Distilling* did not say (on pages 321, 322, or elsewhere) that the Webb-Kenyon Act "empowered [States] to forbid shipments of alcohol to consumers for personal use, provided that [they] treated in-state and out-of-state liquor on the same terms." *Ante,* at 481. Instead, *Clark Distilling* construed the Webb-Kenyon Act to "extend that which was done by the Wilson Act" in that its "purpose was to prevent the immunity characteristic of interstate commerce from being used to permit the receipt of liquor through such commerce in States contrary to their laws." 242 U. S., at 324. The Court takes this passage only to refer to "nondiscriminatory" state laws, *ante,* at 481, but this is not correct. The passage the Court cites implies that the Webb-Kenyon Act also abrogated the nondiscrimination principle of the negative Commerce Clause, since that principle flows from the "immunity characteristic of interstate commerce," no less than any other negative Commerce Clause doctrine. In other words, *Clark Distilling* recognized that the Webb-Kenyon Act took "the protection of interstate commerce away from *all receipt and possession of liquor prohibited by state law.*" 242 U. S., at 325 (emphasis added). *Clark Distilling* thus confirms what the text of the Webb-Kenyon Act makes clear: The Webb-Kenyon Act "extended" the Wilson Act by completely immunizing all state laws regulating liquor imports from negative Commerce Clause restraints.[4]

---

[4] The Court also opines that, quite apart from the Webb-Kenyon Act, the Wilson Act "expressly precludes States from discriminating." *Ante,* at 483. It does not. The Wilson Act "precludes" States from nothing. Instead, it authorizes them to regulate liquor free of negative Commerce Clause restraints by "subject[ing]" imported liquor "to the operation" of state law, taking state law as it finds it. 27 U. S. C. §121. Even if, as

## B

Straying from the Webb-Kenyon Act's text, the Court speculates that Congress intended the Act merely to overrule a discrete line of this Court's negative Commerce Clause cases invalidating "nondiscriminatory" state liquor regulation laws, including *Vance* v. *W. A. Vandercook Co.*, 170 U. S. 438 (1898), and *Rhodes* v. *Iowa*, 170 U. S. 412 (1898). *Ante*, at 478–484. According to the majority, *ante*, at 483–484, the Webb-Kenyon Act left untouched this Court's cases preventing States from regulating liquor in "discriminatory" fashion. See, *e. g.*, *Scott* v. *Donald*, 165 U. S. 58 (1897) *(Scott); Walling* v. *Michigan*, 116 U. S. 446 (1886); and *Tiernan* v. *Rinker*, 102 U. S. 123 (1880). The plain language of the Webb-Kenyon Act makes the Court's guesswork about Congress' intent unnecessary. But even taken on its own terms, the majority's historical argument is unpersuasive. History reveals that the Webb-Kenyon Act overturned not only *Vance* and *Rhodes*, but also *Scott* and therefore its "nondiscrimination" principle.

The origins of the Webb-Kenyon Act are in this Court's decision in *Leisy* v. *Hardin*, 135 U. S. 100 (1890). *Leisy* held that States were prohibited from regulating the resale of alcohol imported from outside the State so long as the liquor stayed in its "original packag[e]." *Id.*, at 124–125. This rule made it more difficult for States to prohibit the in-state consumption of liquor. Even if a State banned the domestic production of liquor altogether, *Leisy* left it powerless to stop the flow of liquor from outside its borders.

Congress reacted swiftly by enacting the Wilson Act in August 1890. The Wilson Act authorized States to regulate liquor "upon arrival in such State" whether "in original pack-

the Court suggests, the Wilson Act does not authorize States to discriminate, *ante*, at 478, the Webb-Kenyon Act extends that authorization to cover discriminatory state laws. The only question here is the scope of the broader, more inclusive Webb-Kenyon Act. The Court's argument therefore adds nothing to the analysis.

ages or otherwise," 27 U. S. C. § 121, and therefore subjected imports to state jurisdiction "upon arrival within the jurisdiction of the State." *Rhodes, supra,* at 433 (Gray, J., dissenting). The Wilson Act accordingly abrogated *Leisy* and similar decisions by subjecting liquor imports to the operation of state law once the liquor came within a State's geographic borders.

Rather than holding that the Wilson Act meant what it said, three decisions of this Court construed the Act to be a virtual nullity. The first was *Scott, supra.* South Carolina had decided to regulate traffic in liquor by monopolizing the sale and distribution of liquor. All liquor, whether produced in or out of the State, could be sold to consumers in the State only by the state commissioner of alcohol. *Id.,* at 66–68, n. 1, 92. The law thus prohibited out-of-state manufacturers and wholesalers, as well as their in-state counterparts, from shipping liquor directly to consumers.

The appellee, Donald, was a citizen of South Carolina who had ordered liquor directly from out-of-state shippers for his own personal use, rather than through the state monopoly system as South Carolina law required. *Id.,* at 59; see also *Scott v. Donald,* 165 U. S. 107, 108–109 (1897) *(Donald).* South Carolina officials seized the liquor he ordered after it had crossed South Carolina lines, but before he had received it. Donald sued the officials for damages, as well as an injunction allowing him to import liquor directly from out-of-state shippers for his own personal use. *Scott, supra,* at 69–70; *Donald, supra,* at 109–110.

The Court held that South Carolina's ban on the direct shipment of liquor unconstitutionally interfered with the right of out-of-state entities to ship liquor directly to consumers for their personal use, entitling Donald to damages and injunctive relief. *Scott, supra,* at 78, 99–100; *Donald, supra,* at 114; see also *Vance, supra,* at 452 (describing the "ruling" of *Scott* to be that a State could not "forbid the

shipment into the State from other States of intoxicating liquors for the use of a resident"). The Court reasoned that the ban on importation, "in effect, discriminate[d] between interstate and domestic commerce in commodities to make and use which are admitted to be lawful." *Scott,* 165 U. S., at 100. The Court reserved the question whether a state monopoly system that allowed consumers to import liquor directly was constitutional; for the Court, it "suffic[ed]" that South Carolina's ban on imports "discriminate[d] against the bringing of such articles in, and importing them from other States." *Id.,* at 101. The Court's excuse for holding that the Wilson Act did not save the State's ban on importation was the same as the Court's excuse today: that the Wilson Act did not authorize "discriminatory" state legislation. *Ibid.* On this basis, the Court affirmed Donald's damages award. *Ibid.*

In response to *Scott,* Senator Tillman of South Carolina quickly introduced the first version of what became the Webb-Kenyon Act. His bill explicitly attempted to reverse the *Scott* decision. The Senate Report on the bill noted that "[t]he effect of [*Scott* was] to throw down all the barriers erected by the State law, in which she is protected by the Wilson bill, and allow the untrammeled importation of liquor into the State upon the simple claim that it is for private use." S. Rep. No. 151, 55th Cong., 1st Sess., 5 (1897). The Report also addressed *Scott*'s holding that South Carolina's ban on importation was "discriminatory" and adopted the *Scott* dissenter's view that the ban on importation effected "no discrimination against citizens of other States." S. Rep. No. 151, at 5. The bill accordingly would have amended the Wilson Act to grant States "'absolute control of . . . liquors or liquids within their borders, by whomsoever produced and for whatever use imported.'" 30 Cong. Rec. 2612 (1897). The bill passed in the Senate without debate. It failed in the House, perhaps because the House Judiciary Committee

added an amendment that barred discrimination against the products of other States, leaving *Scott* intact. H. R. Rep. No. 667, 55th Cong., 2d Sess., 1 (1898).

Meanwhile, the Court continued to narrow the reach of the Wilson Act. In *Rhodes* and *Vance*, the Court even more broadly stripped States of their control over liquor regulation. *Rhodes* did so by holding that the phrase "upon arrival in such State" in the Wilson Act meant that state law could regulate imports only after their delivery to a consignee within the State. 170 U. S., at 421 (internal quotation marks omitted). This meant that States could regulate imported liquor, even when in its original package, but only after it had been delivered to the eventual consignee. *Rhodes*, in other words, read the Wilson Act to overturn *Leisy*, but not *Bowman* v. *Chicago & Northwestern R. Co.*, 125 U. S. 465 (1888), which had recognized a constitutional right to import liquor in its original package free from state regulation until it reached its consignee. *Rhodes*, *supra*, at 423. Like *Leisy*, then, *Rhodes* seriously hampered the ability of States to intercept liquor at their borders.

*Vance* involved the constitutionality of a law very similar to the law struck down in *Scott*. After its loss in *Scott*, South Carolina amended its ban on importation. Rather than flatly banning imports unless they went through the state monopoly system, the new law allowed out-of-state wholesalers and manufacturers to ship liquor directly to consumers, but only if the consumer showed that the liquor passed a state-administered test of its purity. *Vance*, 170 U. S., at 454–455.

*Vance* had two distinct holdings. First, the Court struck down this condition on the direct importation of liquor as an impermissible burden on "the constitutional right of the non-resident to ship into the State and of the resident in the State to receive for his own use." *Id.*, at 455. The Court derived the right to direct importation primarily from the "ruling" of *Scott* that a State could not "forbid the shipment

into the State from other States of intoxicating liquors for the use of a resident." 170 U. S., at 452.

Second, the Court held that, apart from its ban on direct shipments of liquor to consumers, South Carolina's monopoly over liquor distribution was otherwise constitutional. *Id.*, at 450–452. It rejected the argument that this monopoly system was unconstitutionally discriminatory. In particular, the Court reasoned that the monopoly system was not discriminatory because *Scott* had held (a holding that *Rhodes* had fortified) that South Carolina consumers had a constitutional right to import liquor for their own personal use, even if a State otherwise monopolized the sale and distribution of liquor.[5] A monopoly system, the Court implied, was nondiscriminatory under the rule of *Scott* only if it also allowed consumers to import liquor from out-of-state shippers for their own personal use. Three Justices in *Vance* dissented from that holding, on the ground that such a state monopoly system constituted unconstitutional discrimination under, among other cases, *Scott* and *Walling* v. *Michigan*, 116 U. S. 446 (1886). 170 U. S., at 462–468 (opinion of Shiras, J., joined by Fuller, C. J., and McKenna, J.).

*Rhodes* and *Vance* swept more broadly than *Scott*. *Rhodes* held that States lacked power to regulate imported liquor before it reached the consignee, regardless of whether the liquor was intended for the consignee's personal use, see *supra*, at 506; it did not, as the Court implies, simply repeat *Scott*'s holding that consumers had a right to import liquor for their own personal use, *ante*, at 480. *Rhodes'* holding,

---

[5] See *Vance* v. *W. A. Vandercook Co.*, 170 U. S. 438, 451–452 (1898) ("But the weight of [the argument that the state monopoly system is discriminatory] is overcome when it is considered that the Interstate Commerce clause of the Constitution guarantees the right to ship merchandise from one State into another, and protects it until the termination of the shipment by delivery at the place of consignment, and this right is wholly unaffected by the act of Congress [*i. e.*, the Wilson Act] which allows state authority to attach to the original package before sale but only after delivery. *Scott* v. *Donald, supra; Rhodes* v. *Iowa*").

for example, made it easier for bootleggers to circumvent state prohibitions on the resale of imported liquor, because it enabled them to order large quantities of liquor directly from out-of-state interests. For its part, *Vance* held that the right to import for personal use recognized in *Scott* applied even if the State conditioned the right to import directly on compliance with regulatory conditions (*e. g.*, a state-administered purity test). Those broader holdings, consequently, spurred more vigorous congressional attempts to return control of liquor regulation to the States. See R. Hamm, Shaping the Eighteenth Amendment 206–212 (1995) (hereinafter Hamm); Rogers, Interstate Commerce in Intoxicating Liquors Before the Webb-Kenyon Act, 4 Va. L. Rev. 353, 364–365 (1917). The legislative debate in subsequent years accordingly focused on their effect. That may be what misleads the majority into believing that the Webb-Kenyon Act took aim only at *Rhodes* and *Vance*.

Yet early versions of the Webb-Kenyon Act, not to mention the Act itself, also overturned *Scott*'s holding that banning the direct shipment of liquor for personal use was unconstitutionally discriminatory. Like Senator Tillman's initial bill, other early versions of the Webb-Kenyon Act took aim at *Scott, Rhodes*, and *Vance*. They made clear that out-of-state liquor was subject to state law immediately upon entering the State's territorial boundaries, even if intended for personal use. See Hamm 206, 208.

The version that eventually became the Webb-Kenyon Act was likewise designed to overturn the holdings of all three cases, and thus to reverse *Scott*'s "nondiscrimination" principle. The House Report says that the bill was "intended to withdraw the protecting hand of interstate commerce from intoxicating liquors transported into a State or Territory and intended to be used therein in violation of the law of such State or Territory." H. R. Rep. No. 1461, 62d Cong., 3d Sess., 1 (1913). Thus, the bill targeted *Scott*'s notion (as applied by *Vance*) that imports destined for personal use were

exempt from state regulation. There was no mention of an exception for "discriminatory" state laws, though such an amendment to an earlier version of the Webb-Kenyon Act had been proposed before, see *supra*, at 505–506; the idea was that imports were subject to state law once within a State's geographic borders, regardless of the law's character. In fact, proponents of the final version of the bill defeated proposed amendments that would have restrained States from restricting imports destined for personal use, and thereby would have left *Scott* intact. Hamm 215; 49 Cong. Rec. 2921 (1913); see also H. R. Rep. No. 2337, 58th Cong., 2d Sess., 2–3 (1904) (prior unenacted version drawing exception for shipments for in-state personal use).

In contrast to those unenacted amendments, the Webb-Kenyon Act reversed *Scott, Rhodes,* and *Vance* by forbidding the importation of liquor "intended to be received, possessed, sold or in any manner used . . . in violation of any law of such state"—regardless of the nature of the state law or the imported liquor's intended use. See *Seaboard Air Line R. Co.,* 245 U. S., at 304 (noting that the Webb-Kenyon Act allowed States to regulate "irrespective of any personal right in a consignee there to have and consume liquor"). That is why, just four years after its enactment, this Court described the Webb-Kenyon Act as removing "the protection of interstate commerce away from *all receipt and possession of liquor prohibited by state law." Clark Distilling,* 242 U. S., at 325 (emphasis added).

The foregoing historical account belies the majority's claim that the Webb-Kenyon Act left *Scott* untouched. The Court reasons that the Webb-Kenyon Act overturned only those decisions that "'in effect afford[ed] a means by subterfuge and indirection to set [state liquor laws] at naught,'" *ante,* at 482 (quoting *Clark Distilling, supra,* at 324), a description the Court takes to cover *Rhodes* and *Vance,* but not *Scott.* However, *Scott*'s holding, by precluding state monopoly systems from prohibiting direct shipments of liquor to consum-

ers, "set [state liquor laws] at naught" just as *Rhodes* and *Vance* did. The Court concedes that the Webb-Kenyon Act "close[d] the direct-shipment gap" and that *Scott* recognized a constitutional right for consumers to import liquor directly for their own personal use. *Ante,* at 480, 481. These concessions cannot be squared with the Court's simultaneous suggestion, *ante,* at 481–484, that the Webb-Kenyon Act left *Scott* untouched. The only way to overturn *Scott's* direct-shipment holding was to abrogate its premise that South Carolina's monopoly system was unconstitutionally discriminatory, as Senator Tillman recognized from the start. See *supra,* at 505. Reversing *Scott's* holding that a State could not ban direct shipments of liquor to consumers was a core concern of the Webb-Kenyon Act.

Repudiating *Scott's* nondiscrimination holding was also essential to ensuring the constitutionality of state liquor licensing schemes and state monopolies on the sale and distribution of liquor. This is so because the constitutionality of these state systems remained in some doubt even after *Vance.* As explained, *Vance* upheld South Carolina's monopoly system (stripped of its ban on direct shipments) as "nondiscriminatory" only because that system had preserved the constitutional right established in *Scott* and *Rhodes* to send and receive direct shipments of liquor free of state interference. *Supra,* at 506–507. The Court admits that the Webb-Kenyon Act abolished that right. *Ante,* at 481. Had the Webb-Kenyon Act done so without also allowing the States to discriminate, *Vance's* reasoning implied that the Court was likely to strike down state monopoly systems, and therefore probably licensing schemes as well, as unduly "discriminatory." See 170 U. S., at 451 (equating a state monopoly scheme with a private licensing scheme). The only way to stave off that holding, and so to preserve States' ability to regulate liquor traffic, was to overturn *Scott's* "nondiscrimination" reasoning. Faced with a Judiciary that had narrowly construed the Wilson Act, see *supra,* at 504–508,

Congress drafted the Webb-Kenyon Act to authorize *all* state regulation of importation, whether or not "discriminatory." Just as *Rhodes* read the Wilson Act to repudiate *Leisy* but not *Bowman*, see *supra*, at 506, the majority reads the Webb-Kenyon Act to repudiate *Rhodes* but not *Scott*, committing an analogous error. I would not so construe the Webb-Kenyon Act.

## C

The majority disagrees with this historical account primarily by disputing my reading of *Scott*. It reads *Scott* to have held two things: first, that certain discriminatory provisions of South Carolina's monopoly system were not authorized by the Wilson Act, and therefore were unconstitutional; and second, that Donald had a constitutional right to import liquor directly from out-of-state shippers. *Ante*, at 478–480. This recharacterization of *Scott* (together with its mischaracterization of *Rhodes*' holding, see *supra*, at 506) is the basis for the Court's contention that the Webb-Kenyon Act only overruled *Scott*'s second holding, leaving the first untouched. *Ante*, at 481–484.

The Court misreads *Scott*. *Scott* had only one holding: that the state monopoly system unconstitutionally discriminated against Donald by allowing him to purchase liquor from in-state stores, but not directly from out-of-state interests. The issue of direct importation was squarely at issue in *Scott*, not simply "implicit." *Ante*, at 480. This was the only basis, after all, for affirming Donald's damages award for interference with his ability to import goods directly from outside the State. *Scott*'s reasoning that the South Carolina law was unconstitutionally discriminatory was the basis for affirming that award, not a separate and distinct holding.

While South Carolina law also allowed the state alcohol administrator to discriminate against out-of-state liquor when purchasing liquor for sale through the monopoly system, *ante*, at 478–479, any constitutional defect with those

portions of the law would have been at most grounds for allowing Donald to purchase out-of-state liquor through the state monopoly system, as the dissent argued (and as the majority strains to characterize *Scott*'s actual holding, *ante*, at 479). See 165 U. S., at 104–106 (Brown, J., dissenting). But *Scott* rejected that view and held that the broader discrimination effected by the law was grounds for allowing Donald to import liquor directly himself, bypassing the monopoly system entirely. *Scott*'s holding therefore rested on a conclusion that a ban on direct importation was "discrimination" under the negative Commerce Clause. That conclusion was natural for Justice Shiras, the author of *Scott*, whose view apparently was that all state monopoly systems, even ones that seem nondiscriminatory to our modern eyes, were unconstitutionally discriminatory. See *Vance, supra,* at 465, 467 (Shiras, J., dissenting) (citing the nondiscrimination cases *Walling* v. *Michigan,* 116 U. S. 446 (1886), and *Minnesota* v. *Barber,* 136 U. S. 313 (1890)). The Court's narrower understanding of "discrimination" is anachronistic.

*Vance* confirms this reading of *Scott*. *Vance* correctly characterized *Scott* as establishing a right for consumers to receive shipments of liquor directly from out-of-state sources. 170 U. S., at 452. It also characterized *Scott*'s reasoning as resting on the discriminatory character of the state law. 170 U. S., at 449. These two descriptions, taken together, suggest that the discriminatory character of the law was the basis for *Scott*'s holding that Donald had a constitutional right to receive liquor directly, instead of a separate holding. Moreover, *Vance* also implied that a monopoly system that did not allow consumers to receive liquor directly was unconstitutionally discriminatory. See *supra*, at 507. That suggestion supports the idea that *Scott* considered a ban on such direct shipments to be discriminatory.

*Brennen* v. *Southern Express Co.,* 106 S. C. 102, 90 S. E. 402 (1916), likewise bolsters that *Scott* considered South Carolina's ban on direct importation to be unconstitutionally dis-

criminatory, quite apart from the provisions that authorized the state administrator of alcohol to prefer local products over out-of-state ones. See *ante,* at 478–479 (describing discriminatory provisions). In *Brennen,* the court considered the constitutionality of a state monopoly system that channeled all liquor through state dispensaries by banning direct shipments, but that allowed a consumer to import directly one gallon of liquor per month for his own personal use. 106 S. C., at 107–108, 90 S. E., at 403. Though out-of-state liquor had equal access to the state-run liquor dispensaries, see generally 2 S. C. Crim. Code §§ 794–878 (1912) (providing for otherwise nondiscriminatory state-run monopoly system), the court held that this system unconstitutionally discriminated against out-of-state liquor because it allowed consumers to purchase only a limited quantity of liquor via direct shipments, yet unlimited amounts from state stores. The court noted that "there was no limit to the quantity which a citizen who patronized the dispensaries might buy and keep in his possession for personal use," whereas the law limited direct-shipment purchases to a specific quantity each month. 106 S. C., at 108, 90 S. E., at 403. This, the court reasoned, "was, therefore, clearly a discrimination made in favor of liquors bought from the dispensaries," and so was unconstitutionally discriminatory under the rule of *Scott.* 106 S. C., at 108, 90 S. E., at 403–404. The court thus recognized that *Scott*'s reasoning implied that a state monopoly system was unconstitutionally discriminatory unless it allowed consumers to purchase liquor directly from out-of-state shippers on the same terms as they could purchase liquor from the state monopoly system.

*Brennen* refutes the Court's characterization of *Scott.* It shows that the South Carolina system at issue in *Scott* was "discriminatory" because it banned direct importation, not because its provisions authorized the state alcohol administrator to prefer local products. Even the Court concedes that the Webb-Kenyon Act abrogated the right to direct im-

portation recognized in *Scott.* See *ante,* at 480, 481. It follows that the Act also overturned the nondiscrimination reasoning that was the foundation of that right.

In sum, the Webb-Kenyon Act authorizes the discriminatory state laws before the Court today.

## II

There is no need to interpret the Twenty-first Amendment, because the Webb-Kenyon Act resolves these cases. However, the state laws the Court strikes down are lawful under the plain meaning of § 2 of the Twenty-first Amendment, as this Court's case law in the wake of the Amendment and the contemporaneous practice of the States reinforce.

## A

Section 2 of the Twenty-first Amendment provides: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." As the Court notes, *ante,* at 484, this language tracked the Webb-Kenyon Act by authorizing state regulation that would otherwise conflict with the negative Commerce Clause. To remove any doubt regarding its broad scope, the Amendment simplified the language of the Webb-Kenyon Act and made clear that States could regulate importation destined for in-state delivery free of negative Commerce Clause restraints. Though the Twenty-first Amendment mirrors the basic terminology of the Webb-Kenyon Act, its language is broader, authorizing States to regulate all "transportation or importation" that runs afoul of state law. The broader language even more naturally encompasses discriminatory state laws. Its terms suggest, for example, that a State may ban imports entirely while leaving in-state liquor unregulated, for they do not condition the State's ability to prohibit imports on the manner in which state law treats domestic products.

The state laws at issue in these cases fall within § 2's broad terms. They prohibit wine manufacturers from "transport[ing] or import[ing]" wine directly to consumers in New York and Michigan "for delivery or use therein." Michigan law does so by requiring all out-of-state wine manufacturers to distribute wine through licensed in-state wholesalers. *Ante,* at 468–469. New York law does so by prohibiting out-of-state wineries from shipping wine directly to consumers unless they establish an in-state physical presence, something that in-state wineries naturally have. *Ante,* at 470, 474–476. The Twenty-first Amendment prohibits out-of-state wineries from shipping wine into Michigan and New York in violation of these laws. In holding that the Constitution prohibits Michigan's and New York's laws, the majority turns the Amendment's text on its head.

The majority's holding is also at odds with this Court's early Twenty-first Amendment case law. In *State Bd. of Equalization of Cal.* v. *Young's Market Co.,* 299 U. S. 59 (1936), this Court considered the constitutionality of a California law that facially discriminated against beer importers and, by extension, out-of-state producers. The California law required wholesalers to pay a special $500 license fee to import beer, in addition to the $50 fee California charged for wholesalers to distribute beer generally. *Id.,* at 60–61. California law thus discriminated against out-of-state beer by charging wholesalers of imported beer 11 times the fee charged to wholesalers of domestic beer.

*Young's Market* held that this explicit discrimination against out-of-state beer products came within the terms of the Twenty-first Amendment, and therefore did not run afoul of the negative Commerce Clause. The Court reasoned that the Twenty-first Amendment's words are "apt to confer upon the State the power to forbid all importations which do not comply with the conditions which it prescribes." *Id.,* at 62. The Court rejected the argument that a State "must let imported liquors compete with the domestic on equal terms,"

declaring that "[t]o say that, would involve not a construction of the Amendment, but a rewriting of it." *Ibid.* It recognized that a State could adopt a "discriminatory" regulation of out-of-state manufacturers as an incident to a "lesser degree of regulation than total prohibition," for example, by imposing "a state monopoly of the manufacture and sale of beer," or by "channel[ing] desired importations by confining them to a single consignee." *Id.,* at 63 (punctuation omitted). And far from "[not] consider[ing]" the historical argument that forms the core of the majority's reasoning, *ante,* at 485, *Young's Market* expressly rejected its relevance:

> "The plaintiffs argue that limitation of the broad language of the Twenty-first Amendment is sanctioned by its history; and by the decisions of this Court on the Wilson Act, the Webb-Kenyon Act and the Reed Amendment. As we think the language of the Amendment is clear, we do not discuss these matters." 299 U. S., at 63–64 (footnote omitted).

The plaintiffs in *Young's Market* advanced virtually the same historical argument the Court today accepts. Brief for Appellees, O. T. 1936, No. 22, pp. 57–75. *Young's Market* properly reasoned that the text of our Constitution is the best guide to its meaning. That logic requires sustaining the state laws that the Court invalidates.

*Young's Market* was no outlier. The next Term, the Court upheld a Minnesota law that prohibited the importation of 50-proof liquor, concluding that "discrimination against imported liquor is permissible." *Mahoney* v. *Joseph Triner Corp.,* 304 U. S. 401, 403 (1938). One Term after that, the Court upheld two state laws that prohibited the importation of liquor from States that discriminated against domestic liquor. See *Indianapolis Brewing Co.* v. *Liquor Control Comm'n,* 305 U. S. 391, 394 (1939) (noting that the Twenty-first Amendment permitted States to "discriminat[e] between domestic and imported intoxicating liquors");

*Joseph S. Finch & Co.* v. *McKittrick,* 305 U. S. 395, 398 (1939). In sum, the Court recognized from the start that "[t]he Twenty-first Amendment sanctions the right of a State to legislate concerning intoxicating liquors brought from without, unfettered by the Commerce Clause." *Ziffrin, Inc.* v. *Reeves,* 308 U. S. 132, 138 (1939); accord, *Duckworth* v. *Arkansas,* 314 U. S. 390, 398–399 (1941) (Jackson, J., concurring in result); *Carter* v. *Virginia,* 321 U. S. 131, 138–139 (1944) (Black, J., concurring); *id.,* at 139–143 (Frankfurter, J., concurring). The majority gives short shrift to these persuasive contemporaneous constructions of the Twenty-first Amendment, as JUSTICE STEVENS properly stresses. *Ante,* at 495 (dissenting opinion).

### B

The widespread, unquestioned acceptance of the three-tier system of liquor regulation, see *ante,* at 466–467, and the contemporaneous practice of the States following the ratification of the Twenty-first Amendment confirm that the Amendment freed the States from negative Commerce Clause restraints on discriminatory regulation. Like the Webb-Kenyon Act, the Twenty-first Amendment was designed to remove any doubt regarding whether state monopoly and licensing schemes violated the Commerce Clause, as the majority properly acknowledges. *Ante,* at 488–489; see also *supra,* at 510–511. Accordingly, in response to the end of Prohibition, States that made liquor legal imposed either state monopoly systems, or licensing schemes strictly circumscribing the ability of private interests to sell and distribute liquor within state borders. Skilton, State Power Under the Twenty-First Amendment, 7 Brooklyn L. Rev. 342, 345–346 (1938); L. Harrison & E. Laine, After Repeal: A Study of Liquor Control Administration 43 (1936).

These liquor regulation schemes discriminated against out-of-state economic interests, just as Michigan's and New York's direct-shipment laws do. State monopolies that did not permit direct shipments to consumers, for example, were

thought to discriminate against out-of-state wholesalers and retailers by favoring in-state products. See *Vance*, 170 U. S., at 451–452; *supra*, at 507. Private licensing schemes discriminated as well, often by requiring in-state residency or physical presence as a condition of obtaining licenses.[6] Even today, the requirement that liquor pass through a licensed in-state wholesaler is a core component of the three-tier system. As the Court concedes, each of these schemes is within the ambit of the Twenty-first Amendment, even though each discriminates against out-of-state interests. *Ante*, at 466–467, 488–489.

Many States had laws that discriminated against out-of-state products in addition to out-of-state wholesalers and retailers. See Kallenbach, Interstate Commerce in Intox-

---

[6] See Note, Economic Localism in State Alcoholic Beverage Laws—Experience Under the Twenty-First Amendment, 72 Harv. L. Rev. 1145, 1148–1149, and n. 25 (1959) (hereinafter Economic Localism); see also 3 Colo. Stat. Ann., ch. 89, § 4(a) (1935) (residency requirement); 17 Fla. Stat. Ann. § 561.24 (1941) (prohibiting out-of-state manufacturers from being distributors); Ill. Rev. Stat., ch. 43, § 120 (Smith-Hurd 1937) (residency requirement); Ind. Stat. Ann. § 3730(c) (1934) (residency requirement); 1 Md. Ann. Code, Art. 2B, § 13 (1939) (residency requirement); 4B Ann. Laws of Mass., ch. 138, §§ 18, 18A (1965) (residency requirements); 5 Comp. Laws Mich. § 9209–32 (Supp. 1935) (residency requirement); 1 Mo. Rev. Stat. § 4906 (1939) (citizenship requirement); Neb. Comp. Stat., ch. 53, Art. 3, § 53–328 (1929 and Cum. Supp. 1935) (residency requirement), § 53–317 (physical presence requirement); 1 Nev. Comp. Laws § 3690.05 (Supp. 1931–1941) (residency and physical presence requirements); 2 Rev. Stat. of N. J. § 33:1–25 (1937) (citizenship and residency requirements); N. C. Code Ann. § 3411(103)(1½) (1939) (residency requirement); 1 N. D. Rev. Code § 5–0202 (1943) (citizenship and residency requirements); Ohio Code Ann. § 6064–17 (1936) (residency and physical presence requirements); R. I. Gen. Laws, ch. 163, § 4 (1938) (residency requirement); 1 S. D. Code § 5.0204 (1939) (residency requirement); Vt. Rev. Stat., Tit. 28, ch. 271, § 6156 (1947) (residency requirement); 8 Rev. Stat. Wash. § 7306–23G (Supp. 1940) (physical presence requirement), § 7306–27 (citizenship and residency requirements); Wis. Stat. § 176.05(9) (1937) (citizenship and residency requirements); Wyo. Rev. Stat. Ann. § 59–104 (Supp. 1940) (citizenship and residency requirements).

icating Liquors Under the Twenty-First Amendment, 14
Temp. L. Q. 474, 483–484 (1940); T. Green, Liquor Trade Bar-
riers: Obstructions to Interstate Commerce in Wine, Beer,
and Distilled Spirits 12–19, and App. I (1940) (hereinafter
Green).[7] For example, 21 States required that producers
who had no physical presence within the State first obtain a
special license or certificate before doing business within the
State, thus subjecting them to two layers of licensing fees.
*Id.*, at 12. Thirteen States charged lower licensing fees for
wine manufacturers who used locally grown grapes. *Id.*,
at 13. Arkansas went so far as to create a blanket exception
to its licensing scheme for locally produced wine. See 2
Pope's Digest of Stat. of Ark. §§ 14099, 14105, 14113 (1937).
Eight States taxed out-of-state liquor products at greater
rates than in-state products. Green 13. Twenty-nine
States exempted exports from excise taxes that were appli-
cable to imports. *Id.*, at 14. At least 10 States (plus the
District of Columbia) imposed special licensing requirements
on solicitors of out-of-state liquor products. See Harrison &
Laine, *supra*, at 194–195. Like the California law upheld in
*Young's Market*, 10 States charged wholesalers who dealt
in imports greater licensing fees. Economic Localism 1150;
Crabb, State Power Over Liquor Under the Twenty-First
Amendment, 12 U. Det. L. J. 11, 27 (1948); Green 13. Many
States also passed antiretaliation statutes limiting or ban-
ning imports from other States that themselves discrimi-
nated against out-of-state liquor. Economic Localism 1152;
Green 14. All told, at least 41 States had some sort of law

---

[7] See also, *e. g.*, Ill. Rev. Stat., ch. 43, § 115(h) (Smith-Hurd 1937) (special
license for growers of locally grown grapes); 5 Comp. Laws Mich. § 9209–55
(Supp. 1935) (exemption from malt tax for in-state manufacturers); 1 Nev.
Comp. Laws § 3690.15 (Supp. 1931–1941) (special importer's fees; lower li-
cense fees for manufacturers and wholesalers who deal in in-state prod-
ucts); N. M. Stat. Ann. § 72–806 (Supp. 1938) (licensing exemption for in-
state wineries); R. I. Gen. Laws Ann., ch. 167, § 8 (1938) (authorizing state
agency to impose retaliatory tax); Utah Rev. Stat. § 46–8–3 (Supp. 1939)
(requiring state commission to prefer locally grown products).

that discriminated against out-of-state products, many if not most of which (contrary to the Court's suggestion, *ante,* at 485) predated *Young's Market* and its progeny. See, *e. g.,* Green App. I. This contemporaneous state practice refutes the Court's assertion, *ante,* at 484–485, 488–489, that the Twenty-first Amendment allowed States to discriminate against out-of-state wholesalers and retailers, but not against out-of-state products.

Rather than credit the lay consensus this state practice reflects, the Court relies instead on scattered academic and judicial commentary arguing that the Twenty-first Amendment did not permit States to enact discriminatory liquor legislation. *Ante,* at 485–486. Most of the commentators and judges the Court cites did not adopt the construction of the Amendment the Court embraces. For example, some argued that the Twenty-first Amendment only allowed States to enact nondiscriminatory prohibition laws—*i. e.,* to allow "dry states to remain dry." See Note, 55 Yale L. J. 815, 816–817 (1946); de Ganahl, The Scope of Federal Power Over Alcoholic Beverages Since the Twenty-First Amendment, 8 Geo. Wash. L. Rev. 819, 822–823 (1940); Friedman, Constitutional Law: State Regulation of Importation of Intoxicating Liquor Under Twenty-First Amendment, 21 Cornell L. Q. 504, 511–512 (1936); Recent Cases, Constitutional Law—Twenty-first Amendment, 85 U. Pa. L. Rev. 322, 323 (1937); W. Hamilton, Price and Price Policies 426 (1938). The Court, by contrast, concedes that a State could have a discriminatory licensing or monopoly scheme. *Ante,* at 488–489. The Court must concede this, given that state practice shows that the Twenty-first Amendment authorized such practices, and given that the Webb-Kenyon Act allowed States to enforce their own licensing laws, even if they did not prohibit the use and consumption of liquor entirely. Others apparently defended the position that the Twenty-first Amendment did no more than prevent Congress from permitting the direct importation of liquor into a State, leav-

ing the Constitution untouched. See *Joseph Triner Corp.* v. *Arundel,* 11 F. Supp. 145, 146–147 (Minn. 1935); *Young's Market Co.* v. *State Bd. of Equalization of Cal.,* 12 F. Supp. 140, 142 (SD Cal. 1935), rev'd, 299 U. S. 59 (1936). Still others did not state a clear view on the scope of the Twenty-first Amendment. See generally Legislation, Liquor Control, 38 Colum. L. Rev. 644 (1938); Wiser & Arledge, Does the Repeal Amendment Empower a State to Erect Tariff Barriers and Disregard the Equal Protection Clause in Legislating on Intoxicating Liquors in Interstate Commerce? 7 Geo. Wash. L. Rev. 402 (1939) (arguing that the Twenty-first Amendment did not repeal the Equal Protection Clause). Instead of following this confused mishmash of elite opinion—the same sort of elite opinion that drove the expansive interpretation of the negative Commerce Clause that prompted the Twenty-first Amendment—I would credit the uniform practice of the States whose people ratified the Twenty-first Amendment. See *ante,* at 496–497 (STEVENS, J., dissenting).

The majority's reliance on the difference between discrimination against manufacturers (and therefore, their products) and discrimination against wholesalers and retailers is difficult to understand. The pre-Twenty-first Amendment "nondiscrimination" principle enshrined in this Court's negative Commerce Clause cases could not have prohibited discrimination against the producers of out-of-state goods, while permitting discrimination against out-of-state services like wholesaling and retailing. See *Lewis* v. *BT Investment Managers, Inc.,* 447 U. S. 27, 42 (1980) (invalidating state law that discriminated against banks, bank holding companies, and trust companies with out-of-state business operations); *Memphis Steam Laundry Cleaner, Inc.* v. *Stone,* 342 U. S. 389, 394–395 (1952) (invalidating tax that discriminated against solicitors for out-of-state-licensed businesses). Discrimination against out-of-state wholesalers and retailers also risks allowing "economic protectionism." The Court's

concession that the Twenty-first Amendment allowed States to require all liquor traffic to pass through in-state wholesalers and retailers shows that States may also have direct-shipment laws that discriminate against out-of-state wineries.

### III

Though the majority dismisses this Court's early Twenty-first Amendment case law, it relies on the reasoning, if not the holdings, of our more recent Twenty-first Amendment cases. *Ante*, at 486–489. But the Court's later cases do not require the result the majority reaches. Moreover, I would resolve any conflict in this Court's precedents in favor of those cases most contemporaneous with the ratification of the Twenty-first Amendment.

### A

The test set forth in this Court's more recent Twenty-first Amendment cases shows that Michigan's and New York's direct-shipment laws are constitutional. In *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984), this Court established a standard for determining when a discriminatory state liquor regulation is permissible under the Twenty-first Amendment. At issue in *Bacchus* was a Hawaii statute that imposed a 20 percent excise tax on liquor, but exempted certain locally produced products from the tax. The Court held that the Twenty-first Amendment did not save the discriminatory tax. The Court reasoned that the Twenty-first Amendment did not permit state laws that constituted "mere economic protectionism," because the Twenty-first Amendment's "central purpose . . . was not to empower States to favor local liquor industries by erecting barriers to competition." *Id.*, at 276. The Court noted that the State did "not seek to justify its tax on the ground that it was designed to promote temperance or to carry out any other purpose of the Twenty-first Amendment, but instead acknowledg[ed] that the purpose was 'to promote a local industry.'" *Ibid.* (quot-

ing Brief for Appellee Dias, O. T. 1983, No. 82–1565, p. 40). The Court therefore struck down the tax, "because [it] violate[d] a central tenet of the Commerce Clause but [was] not supported by any clear concern of the Twenty-first Amendment." 468 U. S., at 276; accord, *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U. S. 573, 584–585 (1986) ("Our task . . . is to reconcile the interests protected by the" Twenty-first Amendment and the negative Commerce Clause).

Michigan's and New York's direct-shipment laws are constitutional under *Bacchus.* Allowing States to regulate the direct shipment of liquor was of "clear concern" to the framers of the Webb-Kenyon Act and the Twenty-first Amendment. *Bacchus, supra,* at 276. The driving force behind the passage of the Webb-Kenyon Act was a desire to reverse this Court's decisions that had precluded States from regulating the direct shipment of liquor by out-of-state interests. See *supra,* at 508–509. The laws struck down in *Scott,* 165 U. S. 58 (1897), and *Vance* v. *W. A. Vandercook Co.,* 170 U. S. 438 (1898), required out-of-state manufacturers to ship liquor through the State's liquor regulation scheme—exactly what the Michigan and New York schemes do. By contrast, there is little evidence that purely protectionist tax exemptions like those at issue in *Bacchus* were of any concern to the framers of the Act and the Amendment.

Moreover, if the three-tier liquor regulation system falls within the "core concerns" of the Twenty-first Amendment, then so do Michigan's and New York's direct-shipment laws. The same justifications for requiring wholesalers and retailers to be in-state businesses equally apply to Michigan's and New York's direct-shipment laws. For example, States require liquor to be shipped through in-state wholesalers because it is easier to regulate in-state wholesalers and retailers. State officials can better enforce their regulations by inspecting the premises and attaching the property of in-state entities; "[p]resence ensures accountability." 358 F. 3d

223, 237 (CA2 2004). It is therefore understandable that the framers of the Twenty-first Amendment and the Webb-Kenyon Act would have wanted to free States to discriminate between in-state and out-of-state wholesalers and retailers, especially in the absence of the modern technological improvements and federal enforcement mechanisms that the Court argues now make regulating liquor easier. *Ante,* at 492. Michigan's and New York's laws simply allow some in-state wineries to act as their own wholesalers and retailers in limited circumstances. If allowing a State to require all wholesalers and retailers to be in-state companies is a core concern of the Twenty-first Amendment, so is allowing a State to select only in-state manufacturers to ship directly to consumers, and therefore act, in effect, as their own wholesalers and retailers.

B

The Court places much weight upon the authority of *Bacchus. Ante,* at 487–488. This is odd, because the Court does not even mention, let alone apply, the "core concerns" test that *Bacchus* established. The Court instead *sub silentio* casts aside that test, employing otherwise-applicable negative Commerce Clause scrutiny and giving no weight to the Twenty-first Amendment and the Webb-Kenyon Act. *Ante,* at 472–476, 489–493. The Court therefore at least implicitly acknowledges the unprincipled nature of the test *Bacchus* established and the grave departure *Bacchus* was from this Court's precedents. See 468 U. S., at 278–287 (STEVENS, J., dissenting); *James B. Beam Distilling Co.* v. *Georgia,* 501 U. S. 529, 554–557 (1991) (O'CONNOR, J., dissenting). *Bacchus* should be overruled, not fortified with a textually and historically unjustified "nondiscrimination against products" test.

*Bacchus'* reasoning is unpersuasive. It swept aside the weighty authority of this Court's early Twenty-first Amendment case law, see 468 U. S., at 281–282 (STEVENS, J., dissenting), because the *Bacchus* Court thought it "'an absurd

oversimplification'" to conclude that "'the Twenty-first Amendment has somehow operated to "repeal" the Commerce Clause,'" *id.*, at 275 (quoting *Hostetter* v. *Idlewild Bon Voyage Liquor Corp.*, 377 U. S. 324, 331–332 (1964)). The Twenty-first Amendment did not impliedly repeal the Commerce Clause, but that does not justify *Bacchus*' narrowing of the Twenty-first Amendment to its "core concerns."

The Twenty-first Amendment's text has more modest effect than *Bacchus* supposed. Though its terms are broader than the Webb-Kenyon Act, the Twenty-first Amendment also parallels the Act's structure. In particular, the Twenty-first Amendment provides that any importation into a State contrary to state law violates the Constitution, just as the Webb-Kenyon Act provides that any such importation contrary to state law violates federal law. Its use of those same terms of art shows that just as the Webb-Kenyon Act repealed liquor's negative Commerce Clause immunity, the Twenty-first Amendment likewise insulates state liquor laws from negative Commerce Clause scrutiny. Authorizing States to regulate liquor importation free from negative Commerce Clause restraints is a far cry from precluding Congress from regulating in that field at all. See *Bacchus*, *supra*, at 279, n. 5 (STEVENS, J., dissenting). Moreover, *Bacchus*' concern that the Twenty-first Amendment repealed the Commerce Clause is no excuse for ignoring the independent force of the Webb-Kenyon Act, which equally divested discriminatory state liquor laws of Commerce Clause immunity.

Stripped of *Bacchus*, the Court's holding is bereft of support in our cases. *Bacchus* is the only decision of this Court holding that the Twenty-first Amendment does not authorize the in-state regulation of imported liquor free of the negative Commerce Clause. Given the uniformity of our early case law supporting even discriminatory state laws regulating imports into States, then, Michigan's and New York's laws easily pass muster under this Court's cases.

Nevertheless, in support of *Bacchus'* holding that "state regulation of alcohol is limited by the nondiscrimination principle of the Commerce Clause," *ante,* at 487, the Court cites *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority,* 476 U. S. 573 (1986), and *Healy* v. *Beer Institute,* 491 U. S. 324 (1989). *Ante,* at 487. At issue in those cases was the constitutionality of protectionist legislation that controlled the price of liquor in other States. *Brown-Forman, supra,* at 582–583; *Healy, supra,* at 337–338. In invalidating such a statute, *Brown-Forman* found that the Twenty-first Amendment, by its terms, gives "New York only the authority to control sales of liquor in New York, and confers no authority to control sales in other States." 476 U. S., at 585; see also *Healy, supra,* at 342–343 (following *Brown-Forman's* construction). *Brown-Forman* and *Healy* are beside the point in these cases. *Brown-Forman* did not involve a facially discriminatory law. See 476 U. S., at 579. And unlike *Healy,* there is no claim here that the Michigan and New York laws do anything but regulate within their own borders, thereby interfering with the ability of other States to exercise their own Twenty-first Amendment power.

Equally inapposite are the cases the Court cites concerning state laws that violate other provisions of the Constitution or Acts of Congress. *Ante,* at 486–487. Cases involving the relation between the Twenty-first Amendment and Congress' affirmative Commerce Clause power are irrelevant to whether the Twenty-first Amendment protects state power against the negative implications of the Commerce Clause. See *James B. Beam, supra,* at 556 (O'CONNOR, J., dissenting); *Bacchus, supra,* at 279, and n. 5 (STEVENS, J., dissenting). Similarly, my interpretation of the Twenty-first Amendment would not free States to regulate liquor unhampered by other constitutional restraints, like the First Amendment and the Equal Protection Clause. As this Court explained in *Craig* v. *Boren,* 429 U. S. 190, 205–207 (1976), the text and history of the Twenty-first Amendment

demonstrate that it displaces liquor's negative Commerce Clause immunity, not other constitutional provisions.

## IV

The Court begins its opinion by detailing the evils of state laws that restrict the direct shipment of wine. *Ante,* at 466–468. It stresses, for example, the Federal Trade Commission's opinion that allowing the direct shipment of wine would enhance consumer welfare. FTC, Possible Anticompetitive Barriers to E-Commerce: Wine 3–5 (July 2003), available at http://www.ftc.gov/os/2003/07/winereport2.pdf (as visited May 12, 2005, and available in Clerk of Court's case file). The Court's focus on these effects suggests that it believes that its decision serves this Nation well. I am sure that the judges who repeatedly invalidated state liquor legislation, even in the face of clear congressional direction to the contrary, thought the same. See *supra,* at 503–508. The Twenty-first Amendment and the Webb-Kenyon Act took those policy choices away from judges and returned them to the States. Whatever the wisdom of that choice, the Court does this Nation no service by ignoring the textual commands of the Constitution and Acts of Congress. The Twenty-first Amendment and the Webb-Kenyon Act displaced the negative Commerce Clause as applied to regulation of liquor imports into a State. They require sustaining the constitutionality of Michigan's and New York's direct-shipment laws. I respectfully dissent.