BACHARACH, J.,
dissenting on Part KA).
I respectfully dissent on Part 1(A), where the majority concludes that the manufacturers are unlikely to prevail on their discrimination claim. The threshold *748 procedural question is whether we can entertain the contact-lens manufacturers’ as-applied challenge before Utah has enforced the statute. I believe that we can.
The subsequent question is whether the Utah statute violates the dormant commerce clause by discriminating against retailers outside of Utah. In my view, the Utah statute does so. Because of the discrimination against out-of-state retailers, we can uphold the Utah statute only if it survives strict scrutiny.
The district court failed to apply strict scrutiny based on a belief that the statute did not discriminate against out-of-state retailers. In my view, this belief was mistaken; as a result, I would reverse and remand for the district court to apply strict scrutiny when analyzing likelihood of success on the discrimination claim.
I. The Procedural Validity of the Manufacturers’ As-Applied Challenge
Utah questions whether we can consider an injunction because the claim involves application of a statute before it has been enforced. I would hold that the manufacturers can bring an as-applied challenge prior to enforcement.,
Relying on United States v. Gaudreau, 860 F.2d 357 (10th Cir. 1988), Utah argues that the manufacturers could not bring this challenge until the statute is enforced. See Gaudreau, 860 F.2d at 360-61 (“In a declaratory judgment action no one has been charged so the court cannot evaluate the statute as applied.”). But after we decided Gaudreau, the Supreme Court has entertained multiple as-applied challenges prior to enforcement. See Gonzales v. Carhart, 550 U.S. 124, 167, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) (abortion); Wis. Right to Life, Inc. v. Fed. Election Comm’n, 546 U.S. 410, 411-41, 126 S.Ct. 1016, 163 L.Ed.2d 990 (2006) (per curiam) (First Amendment); see also Fed. Election Comm’n v. Wis. Right to Life, Inc., 551 U.S. 449, 481, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) C‘[W]e hold that BCRA § 203 is unconstitutional as applied to WRTL’s ‘Wedding,’ ‘Loan,’ and ‘Waiting' ads.”); Citizens United v. Fed. Election Comm’n, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (implicitly approving of as-applied, pre-enforcement challenges). Under these gosCGaudreau decisions, the manufacturers can bring an as-applied challenge to the Utah statute prior to enforcement.
II. The Practical Effect of the Statute on Retailers Selling Contact Lenses
The district court denied a preliminary injunction based largely on a prediction that the manufacturers could not prove their claims at trial. At oral argument, Utah conceded that we engage in de novo review on likelihood of success. I agree with this concession in determining whether the district court correctly applied the law on the manufacturers’ claim of discrimination against out-of-state retailers.[1] On this claim, I believe that the district court erred.
A. How We Gauge Discrimination
The threshold issue involves how we gauge discrimination: Do we restrict ourselves to the text of the Utah statute, or do we go beyond the statutory text to consider the statute’s practical effect? The ma *749 jority concludes that we should confíne ourselves to the text of the statute. Maj. Op. at 743.1 respectfully disagree.
The Supreme Court has directed us to determine whether the statute “discriminates against interstate commerce either on its face or in practical effect.” Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). Even neutrally worded statutes may violate the dormant commerce clause when the effect is discriminatory. Hunt v. Wash. Apple Advert. Comm’n, 432 U.S. 333, 352-53, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); see also C&A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 394-95, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (holding that a neutrally worded ordinance violated the dormant commerce clause because the effect was discriminatory).
The majority confines its inquiry to the statutory text based on Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997). There, the Supreme Court held that the statutory text facially discriminated against interstate commerce. 520 U.S. at 575-76, 117 S.Ct. 1590. Thus, the Court said that it was unnecessary to go beyond the statutory text. Id.
In my view, this is true only when the statutory text expressly discriminates against interstate commerce. When the statute is neutrally worded, however, the Supreme Court requires us to go further, examining the statute’s practical effect. Maine v. Taylor, 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986); see also Kleinsmith v. Shurtleff, 571 F.3d 1033, 1040 (10th Cir. 2009) (stating that the claimant can prevail under the dormant commerce clause by showing that a facially neutral state statute “discriminates in practical effect”).
I would follow this requirement. Like the majority, I regard the statute as neutrally worded. As a result, I would consider the statute’s practical effect.
B. The Utah Attorney General’s Interpretation of the Statute
The Utah attorney general interprets the statute to apply only to Utah retailers. This interpretation is not binding,[2] but it does provide persuasive evidence on how the statute will be applied. See Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (interpreting a statute based, in part, on the “interpretation of the statute given by those charged with enforcing it”). Under this interpretation, the manufacturers could not enforce their minimum-pricing policies against Utah contact-lens retailers but could enforce the policies against retailers in every other state.
C. The Price Advantage Created by the Statute for Utah Retailers
This interpretation treats similarly situated retailers differently. A retailer in Utah could freely price contact lenses without constraints imposed by any manufacturer. Retailers in the 49 other states could obtain this pricing protection only by relocating to Utah. Unless non-Utah retailers relocate to Utah, they would lack any power to match a Utah retailer’s prices anywhere in the country.[3]
*750 Suppose the four out-of-state manufacturers offer a contact lens to retailers for $5.00 to $10.00.
[[Image here]]
Now, the retailers will want to resell the contact lenses to consumers throughout the country. Utah has one retailer, 1-800 CONTACTS.[4] Under the Utah law, 1-800 CONTACTS can resell the contact lenses to consumers around the country at any price. But all of 1-800 CONTACTS’s competitors are outside Utah, so they will be subject to the manufacturers’ price floors.
For illustration, let’s assume" that the price floor is $25.00. 1-800 CONTACTS could offer the contact lenses at $15,00, underselling all of its out-of-state competitors, who would have to price the contact lenses at $25.00 or more.
*751 [[Image here]]
The Supreme Court squarely invalidated this sort of discrimination in Granholm v. Heald, 544 U.S. 460, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005). That case involved differences in the treatment of wineries in New York and Michigan. Granholm, 544 U.S. at 467, 476, 125 S.Ct. 1885. In both states, the distribution of alcoholic beverages followed a three-tier system, requiring separate licenses for production, wholesale, and retail. Id. at 466, 125 S.Ct. 1885. But both states enacted regulations that permitted instate wineries to bypass this system, allowing them to ship products directly to in-state consumers. Out-of-state wineries could not obtain the same benefit. Id. at 469-71, 125 S.Ct. 1885. This practice violated the dormant commerce clause: The regulations lowered the price of in-state wine relative to out-of-state wine, resulting in discrimination. Out-of-state wineries could obtain equal treatment only by relocating to New York or Michigan. Id. at 473-76, 487-88, 125 S.Ct. 1885. As a result, the Court held that the regulations discriminated against out-of-state retailers. Id. at 487-88, 493, 125 S.Ct. 1885.
The same is true here. Under the Utah statute, contact-lens retailers would enjoy price protection inside Utah but not inside any of the other 49 states. This potential exists partly because Utah hosts a retailer., 1-800 CONTACTS, which sells roughly 99% of its contact lenses outside of Utah. The Utah statute allows 1-800 CONTACTS to always undersell retailers outside of Utah when competing for sales in 49 states., In my view, the Supreme Court *752 outlawed this sort of discrimination in Granholm.
The intervenors ignore this discrimination, focusing instead on the equality enjoyed by manufacturers both inside and outside Utah. I agree with the intervenors that manufacturers are treated equally, but retailers are not. The Utah statute enables a Utah retailer to enjoy price protections that are not enjoyed by retailers in other states (even when competing for sales outside Utah).
D. Violation of the Dormant Commerce Clause by Combining an Industry’s Organization with the Effect of a State Statute
Utah acknowledges the difference in treatment of retailers but attributes the ill effects to the manufacturers’ pricing policies, rather than the state statute. In reality, however, the discriminatory effects are created by a combination of three factors:
1. The Utah statute protects Utah retailers from manufacturers’ policies setting minimum prices.
2. The manufacturers have established minimum-pricing programs for all retailers nationwide.
3. Utah retailers can now undersell retailers in every state when competing for sales in 49 states.
Considered alone, the manufacturers’ pricing policies would treat all retailers in the same way. But Utah retailers gain a competitive edge from a combination of the Utah statute and the manufacturers’ pricing policies.
Utah and the intervenors argue that retailers outside Utah will be hurt only because of the manufacturers’ pricing policies. As Utah and the intervenors contend, the manufacturers can relieve non-Utah retailers of their selling disadvantage by repealing the pricing policies. But in virtually any case, businesses can avoid discriminatory statutes by modifying their policies. That opportunity does not negate the discriminatory nature of the state statute.
The Supreme Court addressed analogous issues involving
• the labeling of superior grade apples in Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977);
• the packaging and shipment of high- . quality cantaloupes in Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970);
• the regulation of the shrimp industry in Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948), and Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928); and
• the establishment of a federal agency’s minimum-pricing scheme in West Lynn Creameny, Inc. v. Healy, 512 U.S. 186, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994).
In Hunt, North Carolina adopted a regulation that had prohibited labeling of apples with anything other than a grade adopted by the United States Department of Agriculture. This regulation affected a program in .the State of Washington that required stringent inspections. 432 U.S. at 336, 97 S.Ct. 2434. North Carolina created a “leveling effect,” which the Supreme Court found had discriminated against interstate commerce: Out-of-state apple growers had to change their marketing strategies to comply with a North Carolina statute on labeling. Id. at 351-52, 97 S.Ct. 2434. The Court noted that “the increased costs imposed by the statute would tend to shield the local apple industry from the competition of [out-of-state] apple growers.” Id. at 351, 97 S.Ct. 2434.
*753 Of course, Washington apple growers could avoid the cost increases by modifying their marketing strategies. But the apple growers didn’t have to. The Supreme Court struck down the regulation because the out-of-state apple growers would experience discriminatory price increases if they continued their existing marketing practices.
Here, out-of-state retailers will be unable to match Utah retailers’ prices unless the out-of-state retailers modify their existing marketing practices. Washington apple growers didn’t have to modify their marketing practices in Hunt, and out-of-state contact-lens manufacturers should not have to do so in our case.
The Supreme Court also addressed similar circumstances in Pike. There, Arizona enacted a statute that required all cantaloupes grown in Arizona to be packaged and shipped in a standard format. 397 U.S. at 138, 90 S.Ct. 844. Under authority. granted by the statute, an Arizona state official issued an order prohibiting a farmer from transporting its Arizona-grown cantaloupes—which were considered “higher quality” than other Arizonan cantaloupes—to California for packing and processing. Id. at 138-39, 90 S.Ct. 844. To comply with the order, the farmer would have had to build packing facilities in Arizona. Id. at 140, 90 S.Ct. 844. The Supreme Court invalidated the order as violating the dormant commerce clause, in part because the order had imposed a “straitjacket” on farmers with respect to the allocation of their interstate resources. Id. at 146, 90 S.Ct. 844.
In itself, the Arizona order would not have violated the dormant commerce clause. But the Supreme Court considered the impact of the order based on how farmers structured their businesses. The farmers didn’t have to restructure their businesses in the face of the Arizona order, and the contact-lens manufacturers should not have to restructure their businesses in the face of Utah’s statute.
The circumstances were also similar in Foster-Fountain Packing and Toomer, where the Supreme Court struck down state laws that interfered with the interstate shrimp industry.
In Foster-Fountain Packing, a Louisiana law prohibited interstate shipment of shrimp when “the heads and hulls [had] not been removed.” 278 U.S. at 8, 49 S.Ct. 1. This law proved discriminatory only because of the way that the shrimp industry was structured: Shrimp were caught in Louisiana waters and processed and canned for interstate shipment in Mississippi. But virtually all shrimp that left Louisiana had their “heads and hulls” intact. Id. at 9-10, 49 S.Ct. 1. Thus, the statute effectively eliminated the shrimp supply for the Mississippi canners. As a result, the Supreme Court struck down the statute under the dormant commerce clause. Id. at 13, 49 S.Ct. 1.
And in Toomer, a South Carolina statute required shrimp boaters to unload, pack, and ship all shrimp caught in South Carolina waters at a South Carolina port. 334 U.S. at 390-91, 68 S.Ct. 1166. Nonetheless, Georgia fishermen would suffer prohibitive costs because they maintained their own docking and packing facilities in Georgia. Id. at 403-04, 68 S.Ct. 1156. Thus, the Supreme Court struck down the statute. Id. at 406, 68 S.Ct. 1156.
The Supreme Court did not force the Mississippi shrimp canners in Foster-Fountain Packing to move to Louisiana, just as the Court did not force the Georgia fishermen to acquire South Carolina docking facilities in Toomer. Similarly, the contact-lens manufacturers should not have to adjust their policies to avoid the discriminatory effect of the Utah statute.
*754 The Supreme Court also applied this approach to a minimum-pricing program in West Lynn Creamery. There, Massachusetts imposed a pricing order that had the net effect of making milk produced in other states more expensive than milk produced in Massachusetts. 512 U.S. at 194-95, 195 n.10, 114 S.Ct. 2205. Producers in other states were handicapped by the pricing order and the minimum prices imposed by a federal agency. Id. at 188-89, 194-95, 114 S.Ct. 2205. The Supreme Court regarded the Massachusetts scheme as discriminatory even though the dealers’ dilemma stemmed frpm a minimum-pricing scheme enacted by a federal agency. Id. at 194-95, 114 S.Ct. 2205. The Court explained: “If there were no federal minimum prices ..., out-of-state producers might still be able to retain their market share by lowering their prices.” Id. at 195, 114 S.Ct. 2205.
Under the argument pressed by Utah and the intervenors, the discriminatory effect in West Lynn Creamery would have been caused by the federal agency’s minimum-pricing program, rather than by the Massachusetts pricing order. But the Supreme Court did not see it that way. Instead, the Court found discrimination based on the market realities faced by out-of-state dealers in a federal system mandating minimum prices.
We should do the same here. Retailers outside Utah will be unable to match prices with Utah retailers, just as out-of-state dealers in West Lynn Creamery could not effectively compete with dealers inside Massachusetts. In both, cases, the constraints resulted from a third party’s requirement of minimum pricing.[5] In my view, there is no principled basis to find discrimination against interstate commerce in West Lynn Creamery and not here.
E. The Manufacturers’ Ability to Discontinue Sales in Utah
The manufacturers can avoid this discrimination at the retail level only by abandoning sales in- Utah. But the manufacturers should not have to abandon sales within Utah solely to retain equal treatment for retailers.
The Supreme Court addressed a similar issue in City of Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). There, the Court confronted a New Jersey statute that prevented entities from bringing trash into New Jersey, holding that the statute discriminated based on the trash’s origin. 437 U.S. at 626-27, 98 S.Ct. 2531. Companies could avoid the statute’s harsh effects by leaving the New Jersey market and shipping trash to other states instead. But the companies did not have to leave New Jersey. And the contact-lens manufacturers should not have to stop doing business with Utah-based retailers.
Utah disagrees, pointing to Exxon Corporation v. Governor of Maryland, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). In Exxon, the Supreme Court upheld a Maryland statute, in part because “[s]ome refiners may choose to withdraw entirely from the Maryland market, but there is no reason to assume that them share of the entire supply [would] not be promptly replaced by other interstate refiners.” Id. at 127, 98 S.Ct. 2207. The Court concluded that the Maryland statute would not curtail access to interstate gasoline refinery markets.
The contact-lens market is different. Contact-lens prescriptions are brand-specific; thus, if one of the contact-lens manufacturers left Utah, Utah retailers would be completely foreclosed from fulfilling *755 prescription orders for that manufacturer’s prescriptions, limiting consumers’ access to certain contact lenses. Unlike gasoline, a fungible good, brand-specific contact lenses are unique goods that cannot be “promptly replaced” by another manufacturer when one manufacturer exits a market.
Some courts have relied on Exxon in upholding restrictions on interstate commerce. In each case, however, the courts noted that the restriction would cause commerce to shift among competitors, not reduce commerce. See, e.g., Yakima Valley Mem’l Hosp. v. Wash State Dep’t of Health, 731 F.3d 843, 847 (9th Cir. 2013) (“What is really at issue is the shifting of business from one competitor to another, not a burden on interstate commerce.”); Nat’l Ass’n of Optometrists & Opticians v. Harris, 682 F.3d 1144, 1153 (9th Cir. 2012) (“[T]he Exxon Court’s decision turned on the interstate flow of goods.... ”); Wood Marine Serv., Inc. v. City of Harahan, 858 F.2d 1061, 1065 (5th Cir. 1988) (explaining that a city ordinance did not reduce the amount of commercial material brought into Louisiana and upholding the ordinance in response to a dormant commerce clause challenge); Am. Motors Sales Corp. v. Div. of Motor Vehicles of Commonwealth of Va., 592 F.2d 219, 223 (4th Cir. 1979) (concluding that a statute that “affect[s] the structure of [a] retail market by shifting business from one out-of-state manufacturer to another” does not run afoul of the dormant commerce clause). Utah’s statute is different: It may eliminate interstate commerce. Therefore, Exxon’s, logic does not apply here.[6]
⅞ * *
For these reasons, I respectfully disagree with the majority. The statute; as interpreted by the attorney general, discriminates between non-Utah and Utah retailers.
Because of this discrimination, the district court should have upheld the statute only if it survived the “strictest scrutiny” of a legitimate local purpose and the absence of nondiscriminatory alternatives. Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 581, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997). The district court did not apply the “strictest scrutiny” to the statute, and Utah does not address whether the statute would survive this level of scrutiny. Without briefing on this issue, I would reverse and remand for the district court to apply strict scrutiny in the first instance.[7] Until the district court does so, it cannot properly assess the manufacturers’ likelihood of success on the merits for the claim involving discrimination against out-of-state retailers.
III. The Remaining Preliminary Injunction Factors
The district court relied heavily on its mistaken view of the manufacturers’ likelihood of success. Alcon Labs., Inc, v. Reyes, No. 2:15-cv-00252-DB, at *16-18, 2015 WL 9236136 (D. Utah May 11, 2015). This mistake colored the district court’s assessment of the other elements for a preliminary injunction (irreparable injury, balancing of the equities, and the public interest). See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).
*756 We do not know how the district court would have ruled if it had correctly assessed the manufacturers’ likelihood of success. See Lawson Prods., Inc. v. Avnet, Inc., 782 F.2d 1429, 1437-38 (7th Cir. 1986) (noting how the “cold record” before an appellate court precludes a full “sense of the equities or the merits of a case” to grant a preliminary injunction). Thus, I believe that we should reverse and remand for the district court to reconsider the equitable elements based on the Utah statute’s discrimination against interstate commerce. See Derma Pen, LLC v. 4Ever-Young Ltd., 773 F.3d 1117, 1121 (10th Cir. 2014) (reversing and remanding for reconsideration of the equitable factors for a preliminary injunction because of the district court’s erroneous assessment of likelihood of success); see also eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 394, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (vacating and remanding for the district court to apply its equitable discretion).
IV. Conclusion
I believe that the district court committed reversible error in its determination regarding likelihood of success. Thus, I would reverse and remand for the district court to (1) apply strict scrutiny and (2) reconsider the remaining preliminary injunction factors of irreparable injury, balancing of the equities, and the public interest.

. Generally, the abuse-of-discretion standard applies on likelihood of success. Verlo v. Martinez, 820 F.3d 1113, 1128 (10th Cir. 2016). But even when the overarching standard is abuse of discretion, we engage in de novo review on matters of law. Fish v. Kobach, 840 F.3d 710, 723 (10th Cir. 2016). A matter of law arises on the validity of the manufacturers’ claim under the dormant commerce .clause. See Jones v. Gale, 470 F.3d 1261, 1267 (8th Cir. 2006).

. See Stenberg v. Carhart, 530 U.S. 914, 917, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) ("[T]he Court’s precedent warns against accepting as 'authoritative' an Attorney General’s interpretation of state law where, as here, that interpretation does not bind the state courts or local law enforcement.”).

. The plaintiffs are manufacturers, not retailers. Thus, a potential issue exists regarding the manufacturers' prudential standing to as *750 sert the rights of retailers. Prudentially, we generally require plaintiffs to assert their own rights rather than those of third parties. Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). But this requirement is prudential, not jurisdictional, Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). As a result, we can decline to consider prudential standing issues when they are not raised by the parties. See Grubbs v. Bailes, 445 F.3d 1275, 1281 (10th Cir. 2006) ("Questions relating to prudential standing .., may be preter-mited in favor of a. straightforward disposition on the merits.”).
In this appeal, no one has questioned the manufacturers’ prudential standing to assert the rights of out-of-state retailers. In the absence of adversarial briefing, I would decline to address the potential issue on prudential standing. See Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir, 2007) (stating that we could decline to address a newly submitted argument involving prudential standing).

. Costco also ships from Utah, suggesting that it may also be able to use the Utah statute to undersell all retailers outside of Utah,

. The legality of the manufacturers’ minimum-pricing policies is not at issue.

. Exxon also did not involve discrimination against out-of-state retailers. See Exxon Corp., 437 U.S. at 126, 98 S.Ct. 2207 (noting that the state statute at issue did not "distinguish between in-state and out-of-state companies in the retail market”).

. The parties do not address whether Utah has waived an argument that the statute would survive under strict-scrutiny. I would leave the issue of a potential waiver to the district court on remand.